**VILLAGE OF MORRISVILLE WATER & LIGHT DEPARTMENT**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY.**

Civ. A. No. 89–322.

United States District Court, D. Vermont.

Oct. 4, 1991.

Russell F. Smith, III, Spiegel & McDiarmid, Washington, D.C., and, William M. Piper, Primmer & Piper, St. Johnsbury, Vt., for plaintiff.

Michael B. Clapp, Dinse, Erdmann and Clapp, Burlington, Vt., for defendant.

COFFRIN, Senior District Judge.

This diversity action involves a dispute between an insurer and its insured concerning coverage for environmental clean-up costs mandated by the U.S. Environmental Protection Agency ("EPA"), pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Specifically, the Village of Morrisville Water & Light Department ("Morrisville") seeks an injunction and a declaratory judgment stating that the United States Fidelity & Guaranty Company ("Fidelity") must defend and indemnify Morrisville for the claims made against it concerning the clean-up of the "Rose Chemicals site" in Holden, Missouri. Both Morrisville and Fidelity have moved for summary judgment.

We heard argument on the parties' cross-motions for summary judgment on September 13, 1991. For the reasons stated below, we hold that the policies provide coverage for the claims concerning the Rose Chemicals site. Therefore, we deny Fidelity's motion for summary judgment. However, genuine issues of material fact exist concerning whether Fidelity's denial of coverage was made in bad faith. Thus, we grant Morrisville's motion for summary judgment in part and deny it in part.

## BACKGROUND

Morrisville is a utility company owned by the Village of Morrisville, Vermont. Fidelity is a Maryland corporation authorized to sell insurance in Vermont. Morrisville was insured by Fidelity from 1983 through 1988, under a comprehensive general liability policy ("CGL policy") and a comprehensive excess indemnity policy ("Indemnity policy").

On July 23, 1984, Morrisville sent material which contained polychlorinated biphenyls ("PCBs") to the Rose Chemicals site in Holden, Missouri. The EPA had approved the site for the disposal of PCBs, but the owner of the site failed to properly treat, store, or dispose of the hazardous materials. The owner eventually abandoned the site, leaving behind soil and water contaminated with millions of pounds of PCBs.

Under CERCLA, the EPA identifies sites contaminated with hazardous materials, and it identifies the parties "potentially responsible" for the contamination. 42 U.S.C. §§ 9601–9625. The EPA may obtain an injunction to compel the potentially responsible parties to clean-up the site, or it may conduct the clean-up itself and then sue the polluters for reimbursement. 42 U.S.C. §§ 9606–07. However, the EPA's general practice has been to encourage the voluntary clean-up of the contaminated sites by the entities responsible for the pollution. *See generally* Note, *Superfund Settlements: The Failed Promise of the 1986 Amendments*, 74 Va.L.Rev. 123 (1988). An agreement between the EPA and the potentially responsible parties is generally embodied in a "consent decree." This consent decree is entered in the federal district court for the district where the contaminated site is located. 42 U.S.C. §§ 9622(a), (b), (d).

■ In the present case, the EPA notified Morrisville in 1986 of its status as a

"potentially responsible party"[1] for the contamination at the Rose Chemicals site. Previously, the EPA had notified other entities, who had also disposed of hazardous waste at the site, that they were considered potentially responsible parties. Some of these entities formed the Rose Chemicals Steering Committee ("Steering Committee"), which then developed a plan for cleaning-up the site.[2]

On January 29, 1989, Morrisville entered into a "Consent Party Agreement" with the EPA and the Steering Committee, and it paid the Steering Committee $15,920.00 for its allocated share of the clean-up costs for the Rose Chemicals site. Under the terms of the Consent Party Agreement, Morrisville remains potentially liable for further clean-up costs. On July 25, 1989, the Steering Committee filed a lawsuit in the United States District Court for the Western District of Missouri[3] against all potentially responsible parties who had not entered into an agreement with the EPA or the Steering Committee concerning the site. By signing the Consent Party Agreement, Morrisville avoided being named as a defendant in that case.

Morrisville timely notified Fidelity of the EPA's claim against it for clean-up costs. Fidelity denied coverage over two years after receiving this notification. Morrisville then brought this action to obtain a declaratory judgment stating that CERCLA clean-up costs are covered under the CGL and Indemnity policies. Morrisville also seeks a declaratory judgment that Fidelity is obligated to defend and indemnify it for all claims concerning the clean-up of the Rose Chemicals site. Finally, Morrisville seeks costs and attorneys' fees for Fidelity's "bad faith" denial of coverage.[4]

Morrisville now moves for summary judgment on its complaint. Fidelity opposes Morrisville's motion, and it moves for summary judgment. This opinion concerns those cross-motions for summary judgment.

## DISCUSSION

■ A moving party is entitled to summary judgment if no genuine issues of material fact exist, and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Both Morrisville and Fidelity agree on the material facts of this case. What they disagree on is whether the CGL and Indemnity policies provide coverage for the claims brought against Morrisville under CERCLA. This issue is appropriately decided by summary judgment, because the construction of an insurance policy is a question of law, not fact. *Vermont Inv. Capital, Inc. v. Granite Mut. Ins. Co.*, 705 F.Supp. 1019, 1021 (D.Vt.), *aff'd*, 888 F.2d 1377 (2d Cir.1989).

1. CERCLA establishes strict liability for: (1) present and former owners of hazardous waste disposal sites; (2) transporters of the wastes; and (3) generators of the waste who arrange for the transport and disposal of the wastes. Liability for clean-up costs may be imposed on one, two, or all three of the responsible parties, regardless of each entity's relative degree of fault, or responsibility for creating the polluted site. 42 U.S.C. § 9607(a).

 Morrisville is subject to liability under section 9607, because of its status as a generator of hazardous waste which was transported to and disposed of at the Rose Chemicals site.

2. The Steering Committee and the EPA signed and implemented two administrative orders concerning the clean-up of the Rose Chemicals site. *See In re Central Louisiana Elec. Co., Inc.*, Admin. Order on Consent No. 86–F–0019 (EPA Region VII Nov. 12, 1986) & Admin. Order on Consent No. 87–F–0007 (EPA Region VII Oct. 29, 1987). Pursuant to these orders, the hazardous waste at the site was evaluated, the site was stabilized, and millions of pounds of PCB contaminated material were removed from the site.

3. This case is entitled *Central Ill. Public Serv. Co. v. Industrial Oil Tank & Line Cleaning Serv.*, 730 F.Supp. 1498 (W.D.Mo.1990). The Steering Committee seeks, among other things, a declaratory judgment that each potentially responsible party who has not signed a consent agreement with the EPA or the Steering Committee is jointly and severally liable for all the clean-up costs for the Rose Chemicals site. Based on the record before us, this case is still pending before the United States District Court for the Western District of Missouri.

4. On November 6, 1989, Fidelity filed an action against Morrisville in the United States District Court for the Western District of Missouri. Fidelity later withdrew that action. Thus, the only case which concerns the issue of coverage under the CGL and Indemnity policies is the case presently before this court.

In order to determine whether summary judgment is appropriate for either party, we must conduct a three-part analysis. First, we must determine whether Vermont or Missouri law applies to the interpretation of the policies at issue. Secondly, we must decide whether the claims against Morrisville are covered under the terms of the CGL and Indemnity policies. Finally, if we determine that the policies do provide coverage, then we must decide whether Fidelity's denial of coverage was made in bad faith.

### I. *Choice of Law*

Morrisville argues that we should apply Vermont law to this case, while Fidelity argues that Missouri law governs the outcome of this case. To resolve this issue we must apply Vermont's choice of law rule for insurance contract actions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

In *Pioneer Credit Corp. v. Carden*, 127 Vt. 229, 233, 245 A.2d 891, 894 (1968), the Vermont Supreme Court looked to the Restatement (Second) of Conflict of Laws § 188 [5] to determine which state law applied to a dispute concerning promissory notes. The trial court had held that Vermont law applied to the promissory notes at issue, because the makers of the notes resided in Vermont and the property offered as security for the notes was located in Vermont. *Id.* at 233, 245 A.2d at 893. The Vermont Supreme Court reversed, because "[i]n evaluating the relative importance of these contact points of the con-

tract, the place of the making and the place of performance are entitled to substantial weight." *Id.* The court concluded that the parties' rights and obligations under the notes were "governed by the law of Massachusetts where the notes were made, delivered and payable." *Id.*

 In the present case, the only contact with Missouri is Morrisville's one-time delivery of hazardous waste to the Rose Chemicals site. In contrast, Vermont has many contacts with the policies and the parties. The policies were negotiated in Vermont, delivered in Vermont, and the premiums were paid in Vermont. Morrisville is located in Vermont and does most of its business in Vermont. The CGL policy also states that it "is issued and delivered subject to the Laws of Vermont ..." *See* CGL policy at Vermont Liability Endorsement.

Fidelity argues that "there can be little doubt that Missouri has a greater concern than Vermont with all the proceedings related to the cleanup of the Rose Chemicals site." Fidelity Motion for Summary Judgment at 3. Although Missouri has a great interest in the clean-up of hazardous waste sites within its borders, the issue in the present case involves a question of policy coverage, not pollution clean-up. We believe that the Vermont Supreme Court would find that Vermont law controls the interpretation of insurance policies which were negotiated, executed, and paid for in Vermont. Therefore, we will apply Vermont law to this case.[6]

---

**5.** According to section 188, the significant factors involved in determining the choice of law in contract cases are:

 (1) ... determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

 (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and

 (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

**6.** The following cases also stand for the principle that an insurance policy should be construed according to the law of the state where the policy was made and where the insured resides. *Westinghouse Elec. Corp. v. Liberty Mut. Ins. Co.*, 233 N.J.Super. 463, 559 A.2d 435, 441–42 (1989); *Triangle Publications, Inc. v. Liberty Mut. Ins. Co.*, 703 F.Supp. 367, 369–70 (E.D.Pa.1989); *Atlantic Wood Indus., Inc. v. Lumbermens Underwriting Alliance*, 196 Ga.App. 503, 396 S.E.2d 541, 542 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 390 S.E.2d 562, 567 (W.Va.1990); *Cf. Avem-*

## II. *Interpretation of the Policies*

When Morrisville sent its material to the Rose Chemicals site in 1984, it was the "Insured" under the CGL and Indemnity policies issued by Fidelity. The CGL policy states, in pertinent part, that Fidelity will:

> pay on behalf of the Insured all sums which the Insured shall become *legally obligated to pay as damages* because of ... *property damage* to which this insurance applies, caused by an *occurrence*, and [Fidelity] shall have the right and duty to defend any *suit* against the Insured seeking *damages* on account of such ... *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent....

*See* CGL Policy at Insuring Agreement (emphasis added). The Indemnity policy also states, in pertinent part, that Fidelity will:

> indemnify the Insured for all sums which the Insured shall become *legally obligated to pay as damages* because of ... *property damage* ... to which this policy applies caused by an *occurrence* which takes place anywhere.

*See* Indemnity Policy at Insuring Agreement (emphasis added).

▇▇▇ Fidelity argues that the policies do not provide coverage because: (A) CERCLA clean-up costs are not "damages;" (B) no "property damage" took place at the site; (C) no "occurrence" was triggered; (D) the EPA's letter to Morrisville is not a "suit;" and (E) public policy precludes coverage for the massive costs associated with CERCLA. We will address each one of these arguments individually.[7]

▇▇▇ Our analysis must be guided by the principles which underlie Vermont's insurance law. In Vermont, an insurance policy must be construed according to "the evident intent of the parties" as discerned from the language used in the policy. *Whitney v. Nationwide Mut. Ins. Co.*, 151 Vt. 510, 511, 562 A.2d 467, 468 (1989). Any disputed terms must be construed according to their "plain, ordinary, and popular" meaning. *American Protection Ins. Co. v. McMahan*, 151 Vt. 520, 522–23, 562 A.2d 462, 464 (1989). Because a policy is prepared by the insurer, all ambiguities must be resolved in favor of the insured. *Peer-*

---

co *Ins. Co. v. Aerotech Ltd.*, 677 F.Supp. 35, 38 (D.Mass.1987) (even though the accident took place in Massachusetts, Vermont law governed because the policy was made there and the insured's principal place of business was in Vermont).

We recognize that some courts have held that the law of the state where the hazardous waste is located governs a dispute concerning policy coverage for CERCLA clean-up costs. *See National Starch & Chem. Corp. v. Great Am. Ins. Co.*, 743 F.Supp. 318, 326 (D.N.J.1990); *A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.*, 741 F.Supp. 298, 300–01 (D.Mass.1990), *aff'd*, 933 F.2d 66 (1st Cir.1991); *Leski, Inc. v. Federal Ins. Co.*, 736 F.Supp. 1331, 1334–37 (D.N.J.1990); *Travelers Indem. Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252, 1252–55 (D.Md.1989). We believe that the Vermont Supreme Court would not adopt this view, because, under Vermont law, the state where the policy was made, delivered, and paid for has the most significant relationship to a dispute concerning policy coverage for a one-time deposit of hazardous waste in another state.

7. Previously, Fidelity had denied coverage because:

> 1. Relief sought is not for property damage as covered under our policy.

2. There has not been an occurrence as covered under our policy of insurance.

3. The policy specifically excludes coverage for losses due to pollution. Please refer to exclusion (f), on the Casualty 20 (9–82) form entitled Comprehensive General Liability Insurance.

*See* Fidelity Letter to Morrisville, Dec. 14, 1988. Because Fidelity raised these three defenses only, Morrisville contends that Fidelity waived the defense that CERCLA clean-up costs do not constitute "damages."

As a matter of Vermont law, Fidelity waived its right to raise additional defenses when it gave Morrisville three specific reasons for denying coverage. *Segalla v. United States Fire Ins. Co.*, 135 Vt. 185, 189, 373 A.2d 535, 538 (1977); *Armstrong v. Hanover Ins. Co.*, 130 Vt. 182, 187–88, 289 A.2d 669, 672–73 (1972); *see also Hamlin v. Mutual Life Ins. Co.*, 145 Vt. 264, 267–70, 487 A.2d 159, 161–62 (1984). However, Fidelity's letter concerned the CGL policy only, not the Indemnity policy. Consequently, Fidelity did not waive the "damages" defense for the Indemnity policy. Because the language is identical in both policies, our analysis of the meaning of the term "damages" applies to both the CGL and the Indemnity policies.

*less Ins. Co. v. Wells,* 154 Vt. 491, 494, 580 A.2d 485, 487 (1990).

Insurers, seeking to avoid their duty to defend, must show that a third party's claim against the insured is entirely excluded from coverage. *City of Burlington v. Glens Falls Ins. Co.,* 133 Vt. 423, 424, 340 A.2d 89, 90 (1975). In the present case, Fidelity has not met its burden, because the CGL and Indemnity policies clearly provide coverage for the claims brought against Morrisville concerning the Rose Chemicals site.

### A. Damages

According to the policies, Fidelity is obligated to defend and indemnify Morrisville for all sums which Morrisville "shall become legally obligated to pay as damages." The term "damages" is not defined. Fidelity maintains that the term only encompasses legal damages awarded by a court of law. Fidelity compares CERCLA clean-up costs to other equitable remedies, like an injunction. Thus, Fidelity concludes that the equitable remedies under CERCLA are not "damages" within the meaning of the CGL and Indemnity policies.

In support of its argument, Fidelity relies on *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977 (8th Cir.) (en banc), *cert denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*"NEPACCO"*). In that case, a divided panel of the Eighth Circuit held that, under Missouri law, CERCLA clean-up costs were not "damages" under a comprehensive general liability policy. *Id.* at 985–86. The court reasoned that the term "damages" must mean legal damages when used in the context of an insurance policy, not equitable relief such as environmental clean-up costs mandated by the EPA. *Id.*

Perhaps under Missouri law, the term "damages" has the technical meaning stated by the Eighth Circuit in *NEPACCO.*[8] However, under Vermont law, no distinction between legal and equitable remedies can be read into the plain meaning of the term. Damages are defined as "money claimed by, or ordered paid to, a person to compensate for injury or loss caused by the wrong of the opposite party or parties." Webster's New World Dictionary 348 (3d ed. 1988).[9] Nothing in this definition suggests that "damages" includes only money awarded by a court of law. Moreover, Vermont has abolished the antiquated distinction between legal and equitable claims brought in its court system. *See* Vt. Const., Ch. II, § 31.

In *State of Vermont v. Glen Falls Ins. Co.,* 137 Vt. 313, 319, 404 A.2d 101, 105 (1979), the Vermont Supreme Court held that "damages" included punitive damages, as well as compensatory damages. The court stated that the plain meaning of "damages" encompassed all the money assessed as damages, "regardless of how characterized." *Id.* In *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 754 F.Supp. 358, 366 (D.Vt.1990), Judge Parker of this court predicted that the Vermont Supreme Court would find that environmental clean-up costs assessed under state law are "damages" within the meaning of a liability policy. Likewise, we predict that the Vermont Supreme Court would find that environmental clean-up costs assessed under CERCLA are "damages" within the meaning of the CGL and Indemnity policies.

Fidelity states that the case law on this issue is sharply divided. We think the division is "sharp" only with respect to the contrast between the two positions. The clear majority of courts have held that

**8.** Other courts have declined to follow the Eighth Circuit's analysis of Missouri law. *See Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.,* 944 F.2d 940 (D.C.Cir.1991); *Jones Truck Lines v. Transport Ins. Co.,* Civ. No. 88–5723 (E.D.Pa. May 10, 1989) (found in Westlaw at 1989 WL 49517); *See also NEPACCO,* 842 F.2d at 988 (three dissenting judges state that, under Missouri law, the plain meaning of the

term "damages" encompasses CERCLA clean-up costs).

**9.** A Vermont court may take judicial notice of the dictionary definition of terms not defined in an insurance policy. *Simpson v. State Mut. Life Assurance Co. of Am.,* 135 Vt. 554, 55, 382 A.2d 198, 200 (1977).

CERCLA clean-up costs are "damages" within the meaning and scope of comprehensive general liability policies. The majority have found that the plain meaning of the term is not restricted to sums awarded by judicial order. Applying rules of construction identical to Vermont's rules, the majority found coverage for clean-up costs which were assessed pursuant to CERCLA or state environmental laws.[10]

In *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1188 (3d Cir.1991), the Third Circuit held that the plain meaning of "damages" encompasses CERCLA response costs and other equitable relief. Similarly, the Second Circuit held that, under New York law, a proceeding commenced by a state environmental agency to recover clean-up costs exposes the insured to "damages" within the meaning of a comprehensive general liability policy. *Avondale Indus., Inc. v. Travelers*

*Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). The Second Circuit reasoned that "viewed from the insured's perspective, we think an ordinary businessman reading this policy would have believed himself covered for the demands and potential damage claims now being asserted in the [state] administrative proceeding, particularly absent any specific exclusionary language in the policy." *Id.*[11]

Under CERCLA, the EPA is charged with the duty of removing hazardous waste from any property, even if the government has no ownership interest in that property. The EPA recovers the clean-up costs from responsible parties, either voluntarily or by judicial process, as compensation for the losses sustained in restoring the site back to its natural condition. *Outboard Marine Corp. v. Liberty*

**10.** *See Independent Petrochemical Corp. v. Aetna Casualty & Sur.*, 944 F.2d 940 (D.C.Cir.1991); *Claussen v. Aetna Casualty & Sur. Co.*, 754 F.Supp. 1576, 1582–83 (S.D.Ga.1990) (applying Georgia law); *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 174 (M.D.Pa. 1989) (applying Pennsylvania law), *amended in part on reh'g*, 738 F.Supp. 896 (M.D.Pa.1990), *aff'd*, 928 F.2d 1131 (3d Cir.1991); *National Indem. Co. v. United States Pollution Control, Inc.*, 717 F.Supp. 765, 766–67 (W.D.Okla.1989) (applying Oklahoma law); *Chesapeake Utils. Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 558–61, 565 (D.Del.1989) (applying Maryland law and finding that the Fourth Circuit misstated Maryland law in *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987)); *Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F.Supp. 1171, 1186–93 (N.D.Cal.1988) (applying California law); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1168 (W.D.Mich.1988) (applying Michigan law); *Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.*, 677 F.Supp. 342, 349–50 (E.D.Pa.1987) (applying Pennsylvania law); *New Castle County v. Hartford Accident & Indem. Co.*, 673 F.Supp. 1359, 1365–66 (D.Del.1987) (applying Delaware law); *Township of Gloucester v. Maryland Cas. Co.*, 668 F.Supp. 394, 398–400 (D.N.J.1987) (applying New Jersey law); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75 (E.D.Mich.1987) (applying Michigan law); *AIU Ins. Co. v. The Superior Court of Santa Clara County*, 51 Cal.3d 807, 814, 274 Cal.Rptr. 820, 826, 799 P.2d 1253, 1259 (1990); *Atlantic Wood Indus., Inc. v. Lumbermens Underwriting Alliance*, 196 Ga.App. 503, 396 S.E.2d 541, 543 (1990), *cert. denied,* — U.S. —, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); *Outboard*

*Marine Corp. v. Liberty Mut. Ins. Co.*, 212 Ill. App.3d 231, 156 Ill.Dec. 432, 570 N.E.2d 1154, 1162, *appeal allowed*, 139 Ill.2d 598, 159 Ill.Dec. 110, 575 N.E.2d 917 (1991) (an injunction sought by the EPA is also "damages" within the meaning of the policy); *United States Fidelity & Guar. v. Specialty Coatings Co.*, 180 Ill.App.3d 378, 390–95, 129 Ill.Dec. 306, 314–17, 535 N.E.2d 1071, 1079–82, *appeal denied*, 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 699, 555 N.E.2d 576, 583 (1990); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 586, 336 N.W.2d 838, 843 (1983); *CPS Chemical Co., Inc. v. Continental Ins. Co.*, 222 N.J.Super. 175, 536 A.2d 311, 315 (1988); *Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co. of N.Y.*, 218 N.J.Super. 516, 525–30, 528 A.2d 76, 81–83 (1987); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 877–85, 784 P.2d 507, 511–15 (1990).

**11.** State courts have also held that clean-up costs mandated by state environmental agencies are "damages" within the meaning of comprehensive general liability policies. *See* footnote 10, *supra; see also Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 182 (Minn.1990) (claims asserted by state environmental agency and the EPA against the insured amount to a claim for damages); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co., Inc.*, 326 N.C. 133, 388 S.E.2d 557, 569 (1990) (viewing the policy at issue "as a whole" shows that "a reasonable person in the position of the insured may have understood that the term 'damages' included state-ordered environmental cleanup costs").

*Mut. Ins. Co.*, 212 Ill.App.3d 231, 156 Ill. Dec. 432, 570 N.E.2d 1154, 1160, *appeal allowed* 139 Ill.2d 598, 159 Ill.Dec. 110, 575 N.E.2d 917 (1991). The costs of restoring property to its natural state has long been recognized as a measure of compensatory damages in common-law pollution cases. *Minnesota Mining & Mfg. Co.*, 457 N.W.2d at 183; *Cf. Dean v. Arena*, 141 Vt. 647, 650, 450 A.2d 1143, 1145 (1982) (compensatory damages awarded to recover the cost of repairing property damaged by defendant). We fail to see how the cost of restoring property to its natural condition loses its status as "damages" simply because the EPA seeks to recover those costs voluntarily.

In this case, Morrisville, having insured itself against liability for "damages," could reasonably conclude that it was protected from financial loss without regard to the basis upon which its liability might technically be premised. Nothing in the CGL and Indemnity policies indicates an intent to exclude CERCLA clean-up costs from coverage. We acknowledge that some courts have followed the Eighth Circuits's decision in *NEPACCO*.[12] However, a second reasonable (albeit technical) interpretation of the term "damages" simply creates an ambiguity which must be strictly construed against Fidelity. *Peerless Ins. Co.*, 154 Vt. at 494, 580 A.2d at 487. Therefore, we find that the term "damages" encompasses the CERCLA clean-up costs assessed against Morrisville for the Rose Chemicals site.

### B. Property Damage

Fidelity's obligations under the policies are triggered only if the damages are because of "property damage." *See* CGL and Indemnity policies at Insuring Agreement. In other words, to come within the scope of coverage under the policies, the claims against Morrisville must result from property damage. Both policies define "property damage," in part, as "(1) the physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom...." *See* CGL Policy at Definitions; Indemnity Policy at Insuring Agreement.

Fidelity states three reasons why no "property damage" has occurred at the Rose Chemicals site. First, no property damage has occurred, because "there are no pending or contemplated claims alleging property damage to adjoining landowners or others arising out of the contamination at the Rose Chemicals site." Fidelity Motion for Summary Judgment at 10. However, the fact that adjoining landowners have yet to make a claim is not relevant to this case. Nothing in the CGL or Indemnity policies indicates that injury or damage to adjoining properties determines whether "property damage" has occurred.[13]

Secondly, Fidelity argues that no property damage has occurred, because the EPA made no claim under 42 U.S.C. § 9607(a)(4)(*C*). This section states that the EPA may recover "damages for injury to, destruction of, or loss of natural resources...." In contrast, Morrisville paid its share of the clean-up costs, pursuant to 42 U.S.C. § 9607(a)(4)(*B*).[14] Because no

---

**12.** *See Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir.1988) (applying South Carolina law); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir.1987) (applying Maryland law), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Travelers Indem. Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252, 1255 (D.Md.1989) (applying Maryland law); *Aetna Casualty & Sur. Co. v. Gulf Resources & Chem. Corp.*, 709 F.Supp. 958, 961–62 (D.Idaho 1989) (court does not specify which state law it is applying); *W.C. Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513, 1515 (N.D.Fla.1988) (applying Florida law); *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 18–20 (Me.1990).

**13.** In any event, the record contains a report which indicates that PCBs have been detected in an area adjacent to the Rose Chemicals site. *See* Burns & McDonnell Engineering Co., Report on the Remedial Investigation of the Rose Chemicals Site Holden, Missouri, Executive Summary at ES–15 (February 1990).

**14.** Under section 9607(a)(4)(B), a polluter is liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." In this case the "other person" is the Steering Committee. When it signed the Consent Party Agreement, Morrisville reimbursed the Steering Committee for its share of the clean-up costs, pursuant to section 9607(a)(4)(B).

claim was made under section 9607(a)(4)(C), Fidelity concludes that no "property damage" has occurred at the Rose Chemicals site.

Fidelity relies on *Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325 (4th Cir.1986) as support for this argument. In *Mraz*, the EPA sought to recover the costs [15] it incurred in cleaning-up a hazardous waste site created by the plaintiffs. *Id.* at 1326. The Fourth Circuit held that the insurer had no duty to defend or indemnify the plaintiffs, because the EPA had "not sought recovery for damage to natural resources," pursuant to section 9607(a)(4)(C). *Id.* at 1329. The court reasoned that:

> [o]ne cannot equate response costs with 'injury to or destruction of tangible property,' this policy's definition of property damage. Instead, the response costs are an economic loss. Therefore, the [claims by the EPA against the plaintiffs do] not allege a loss of property damage.

*Id.; accord Aetna Casualty & Sur. v. Gulf Resources & Chem. Corp.*, 709 F.Supp. 958, 961 (D.Idaho 1989).

We must respectfully disagree with the Fourth Circuit, because the various cost recovery provisions contained in CERCLA all involve "property damage." Sections 9607(a)(4)(A)–(D) simply identify alternative methods for recovering clean-up and restoration costs. In other words, it does not matter which CERCLA provision the EPA chooses for recovering clean-up costs, the costs themselves are the result of property damage caused by hazardous waste.[16]

Furthermore, the distinctions found in CERCLA, a federal statute, are not relevant to the interpretation of insurance policies under state law. *Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F.Supp. 1171, 1186–87 (N.D.Cal.1988). The *Mraz*

court makes no reference to state law. Thus, the *Mraz* opinion is not helpful for our analysis in this case.

■ Finally, Fidelity argues that no property damage has occurred, because Morrisville cannot prove that the specific material it sent to the Rose Chemicals site has actually contaminated the site with PCBs. However, the evidence in the record shows the contrary. The EPA informed Morrisville that it had:

> determined that a release of hazardous substances, as defined by Section 104(14) of CERCLA, has occurred at the [Rose Chemical] site and that there is a substantial threat of further releases of hazardous substances at the Facility. At the present time, PCBs are the hazardous substances of concern at the site that are endangering and threatening to endanger the public health or welfare or the environment. *Releases of PCBs have occurred at the site causing the contamination of soils and sediments. The manner in which the PCBs and PCB items are stored or otherwise located at the facility and the abandonment of the site by Martha C. Rose Chemicals, Inc. ... creates the potential for further releases of PCBs* through spills and the subsequent air transport of PCB contaminated dust, precipitation runoff from contaminated areas and percolation to groundwater.

*See* EPA Letter at 2, Dec. 1, 1986 (emphasis added). Besides the EPA, the Steering Committee has also documented that the hazardous materials which were sent to the Rose Chemicals site were improperly disposed of by the owner, and these materials are contaminating and will continue to contaminate the site until the clean-up is completed.[17] We have found nothing in the

**15.** The EPA sought to recover these costs, pursuant to 42 U.S.C. § 9607(a)(4)(A). This section states that a polluter is liable for "all costs of removal or remedial action incurred by the United States Government...."

**16.** *AIU Ins. Co. v. Superior Court of Santa Clara County*, 51 Cal.3d 807, 843, 274 Cal.Rptr. 820, 846, 799 P.2d 1253, 1279 (1990) (Whatever the dominant motive of the EPA, "the event precip-

itating their legal action is contamination of property"); *Aerojet Gen. Corp. v. San Mateo County Superior Court*, 211 Cal.App.3d 216, 257 Cal.Rptr. 621, 633 (1989) (all CERCLA provisions involve the restoration of property to its previously uncontaminated state).

**17.** *See* Burns & McDonnell Engineering Co., Report on the Remedial Investigation of the Rose Chemicals Site Holden, Missouri, (February

record to support the inference that the material which Morrisville sent to the site was disposed of properly and poses no threat to the environment.

Morrisville purchased the CGL and Indemnity policies from Fidelity to protect it in the event that its actions caused "physical injury to or destruction of tangible property." The Rose Chemicals site is certainly "tangible property." [18] The evidence on record shows that the improper disposal of the hazardous material sent by Morrisville (and other responsible parties) contaminated the site with PCBs. This hazardous material undoubtedly has caused and continues to cause physical injury to the buildings, land, water, and air at the site. *C.D. Spangler Constr. Co.*, 326 N.C. at 146, 388 S.E.2d at 565 (contamination of groundwater and soil by chromic acid caused physical injury to tangible property). Because policy language must be given its plain meaning, we find that the material which Morrisville sent to the Rose Chemical site caused "property damage" within the meaning of the CGL and Indemnity policies.[19]

### C. Occurrence

Even if the claims against Morrisville constitute "damages" and "property damage," coverage under the policies exists only if the property damage was "caused by an occurrence." An "occurrence" is defined as "an accident or unexpected event, including continuous or repeated ex-posure to substantially the same general conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." CGL policy at Definitions; *see also* Indemnity policy at Insuring Agreement & Exclusion 3.1. The present dispute concerns whether an "accident or unexpected event" happened at the Rose Chemicals site during 1983–1988, which was the period covered by the CGL and Indemnity policies.

Morrisville claims that an "occurrence" was triggered when the material it sent was improperly disposed of at the Rose Chemicals site, and it was also triggered "through the discovery of the contamination by EPA and state officials and continuing until the contamination is cleaned up." Morrisville Motion for Summary Judgment at 30–31. Fidelity contends that an "occurrence" never took place, because Morrisville purposefully sent the hazardous material to the site.

█ In Vermont, an "accident or unexpected event" is defined for insurance purposes as an "unexpected happening without intention or design." *Commercial Union Ins. Co. v. City of Montpelier*, 134 Vt. 184, 186, 353 A.2d 344, 346 (1976). The "unexpected happening" is the harm which occurs, not the act which causes the harm. In other words, an intentional act can constitute an "occurrence," if the *harm* which

1990); Burns & McDonnell Engineering Co., Feasibility Study for the Rose Chemicals Site (January 1990); *see also* Memo from Steering Committee to Newly Identified Generators of PCB Materials Shipped to the Rose Chemicals Site, at 3–5 (September 26, 1986) (summary of testimony before a committee of Congress concerning improper disposal of PCB contaminated material at the site).

18. We assume from the record before us that the Rose Chemicals site is privately owned. Nevertheless, the federal government has a property interest in the safety and protection of the natural resources of the United States. *C.D. Spangler Constr. Co.*, 326 N.C. at 145, 388 S.E.2d at 564 (citations omitted); *Kipin Indus., Inc. v. American Universal Ins. Co.*, 41 Ohio App.3d 228, 535 N.E.2d 334, 337 (1987). Thus, any injury to the natural resources at the Rose Chemicals site also damages the federal government's property interest in the site. In any event, nothing in the CGL and Indemnity policies limits coverage to privately owned property, and nothing excludes public property or the public interest in the use and safety of the privately owned property.

19. *The following courts have also found that the contamination of natural resources by a hazardous substance constitutes "property damage" within the plain meaning of a liability policy. Hays v. Mobil Oil Corp.*, 930 F.2d 96, 102 (1st Cir.1991); *NEPACCO*, 842 F.2d at 983; *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir.1986); *AIU Ins. Co.*, 51 Cal.3d at 836, 274 Cal.Rptr. at 841, 799 P.2d at 1274; *Kipin Indus., Inc. v. American Universal Ins. Co.*, 41 Ohio App.3d 228, 535 N.E.2d 334, 337 (1987); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 589, 336 N.W.2d 838, 843 (1983); *CPS Chem. Co. v. Continental Ins. Co.*, 222 N.J.Super. 175, 188, 536 A.2d 311, 317 (1988); *Boeing Co. v. Aetna Casualty & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 515 (1990).

results from that act was not expected or intended by the insured.[20]

■ In the present case, Morrisville intentionally sent PCB-contaminated material to the Rose Chemicals site. However, this intentional act does not negate coverage, because Morrisville neither expected nor intended to damage the site. Moreover, the harm in this case happened after the material reached the site. The EPA certified the site as a legal disposal site for PCB-contaminated material. Morrisville, along with many other utility companies, relied upon this certification. The harm occurred because of the improper and illegal disposal of the hazardous material at the site. Because the improper disposal was an "accident" which resulted in property damage neither expected nor intended by Morrisville, an "occurrence" happened within the meaning of the CGL and Indemnity policies.[21]

■ The next issue we must decide is whether the "occurrence" happened between 1983 and 1988. Fidelity argues that the evidence in the record is insufficient to determine this issue. We disagree. The record shows that the hazardous materials sent to the Rose Chemicals site in the early 1980's were improperly disposed of at the site. *See* footnote 17 *supra*. Morrisville sent its shipment of PCB-contaminated material to the site in 1984. The PCBs eventually dispersed into the air, or leaked into the groundwater, soil, or buildings at the site. *See* Burns & McDonnell Engineering Co., Report on the Remedial Investigation of the Rose Chemicals Site in Holden, Missouri, February 1990. Damage to the site revealed itself at least by December 1, 1986; the date the EPA notified Morrisville of its status as a potentially responsible party under CERCLA.

In cases involving exposure to toxic substances, courts have used five different rules to determine if an "occurrence" was triggered during the policy period. For example:

(1) The Exposure Rule—damage occurs when the environment is first exposed to the toxic chemical; i.e. when the toxin is deposited in the landfill.[22]

(2) The Manifestation Rule—damage occurs when it becomes apparent to the injured party; i.e. damage occurs when the EPA or private owner discovers that toxic waste has leaked onto the soil or into the groundwater.[23]

(3) The Double Trigger Rule—damage occurs when the environment is first exposed to the toxic chemical and at the time the damage becomes apparent to the injured party.[24]

(4) The Triple or Continuous Trigger Rule—damage occurs when the environ-

**20.** *See State of Vermont v. Glens Falls Ins. Co.,* 137 Vt. 313, 316, 404 A.2d 101, 103 (1979) (seizure of mobile home was an occurrence because no harm was intended by the insured); *Otterman v. Union Mut. Fire Ins. Co.,* 130 Vt. 636, 638–39, 298 A.2d 547, 549 (1972) (shooting of a policeman was an occurrence because no harm was expected or intended by the insured); *Cf. N.W. Elec. Power Co-op., Inc. v. American Motorists Ins. Co.,* 451 S.W.2d 356, 362–64 (Mo. Ct.App.1969) (damage to land caused by placement of power line outside of easement was an "accident" because the insured did not intend to cause the injury).

**21.** *See also Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.,* 677 F.Supp. 342, 346 (E.D.Pa. 1987) ("The dumping of the waste is an occurrence within the policy because it was an accident from the insured's standpoint. The facts do not indicate that [the insured] expected or intended illegal and harmful dumping of its toxic waste."); *see also Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 517 A.2d 800, 802 (1986)

(an "accident" is present when an "unexpected, independent and unforseen circumstance exists or happening occurs which produces or brings about the result of injury or death").

**22.** *See Federal Ins. Co. v. Susquehanna Broadcasting Co.,* 727 F.Supp. 169, 175 (M.D.Pa.1989), *amended in part,* 738 F.Supp. 896 (1990), *aff'd,* 928 F.2d 1131 (1991); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139, 1170 (W.D.Mich.1988); *Centennial Ins. Co. v. Lumbermens Mut. Casualty Co.,* 677 F.Supp. 342, 346–47 (E.D.Pa.1987); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 76 (E.D.Mich.1987).

**23.** *Mraz,* 804 F.2d at 1328; *Peerless Ins. Co. v. Strother,* 765 F.Supp. 866, 870 (E.D.N.C.1990).

**24.** *Transamerica Ins. Co. v. Bellefonte Ins. Co.,* 490 F.Supp. 935, 938–39 (E.D.Pa.1980) (case concerns toxic drugs ingested by pregnant women).

ment is first exposed to the toxic chemical, at the time the damage first becomes apparent, and at all times in between.[25]

(5) The Actual Injury Rule—damage occurs when the property is actually harmed by the toxic chemical, but the damage does not have to be apparent because symptoms may manifest themselves well after the injury occurs.[26]

In *American Protection Ins. Co. v. McMahan*, 151 Vt. 520, 523–24, 562 A.2d 462, 465–66 (1989), the Vermont Supreme Court held that exposure to formaldehyde gas triggered the insurer's duty to defend, because mere exposure to the gas could cause "bodily injury." The court noted that the symptoms of many diseases do not manifest themselves until long after the initial exposure to the toxic chemical. Thus, the court rejected the argument that manifestation of disease was the sole trigger for coverage, because that argument would allow insurers to terminate coverage despite the fact that "bodily injury" had occurred during the policy period. *Id.* at 524, 562 A.2d at 465.

Like a person exposed to toxic chemicals, the environment does not necessarily display the harmful effects from exposure to PCBs until long after the initial exposure. *See Industrial Steel Container Co.*, 399 N.W.2d at 159–60. The *McMahan* case suggests that the Vermont Supreme Court would adopt the "exposure rule" to the present case, and it would find that an "occurrence" was triggered when the Rose Chemicals site was first exposed to the PCBs sent by Morrisville.

However, we need not predict which rule the Vermont Supreme Court would adopt

in this case, because under any rule an "occurrence" was triggered during the period covered by the policies. As stated earlier, between 1984 and 1986, the material which Morrisville sent to the Rose Chemicals site was improperly disposed of at the site, the PCBs leaked into the environment, and property damage manifested itself to the EPA.[27] Thus, regardless of whether the Vermont Supreme Court were to select the "exposure," "manifestation," "double trigger," "triple trigger," or "actual injury" rule, these facts show that an "occurrence" was triggered within the period covered by the CGL and Indemnity policies.

### D. Duty to Defend under the CGL Policy

The CGL policy states that Fidelity "shall have the right and duty to defend any suit against [Morrisville] seeking damages on account of ... property damage." CGL policy at Insuring Agreement. Fidelity contends that "absent a pending judicial or administrative proceeding naming the insured as a defendant, the insured's duty to defend does not arise." Fidelity's Proposed Conclusions of Law at 4–5. Specifically, Fidelity contends that it has no duty to defend Morrisville against the claims made by the EPA, because Morrisville is not a defendant in a traditional lawsuit for money damages.

The term "suit" is not defined in the CGL policy. Nonetheless, nothing in the policy indicates that Fidelity's duty to defend is triggered solely by a court or administrative proceeding. The term "suit" is generally defined as an "action to secure justice in a court of law" *or* an "attempt to recover a right or claim through legal action." Webster's New World Dictionary 1339 (3d ed. 1988). Because the plain

**25.** *Liberty Mut. Ins. Co. v. Triangle Indus. Inc.*, 765 F.Supp. 881, 885 (D.W.Va.1991); *Time Oil Co. v. Cigna Property & Casualty Ins. Co.*, 743 F.Supp. 1400, 1417 (W.D.Wash.1990); *Gottlieb v. Newark Ins. Co.*, 238 N.J.Super. 531, 570 A.2d 443, 446–47 (1990).

**26.** *Detrex Chem. Indus., Inc. v. Employers Ins. of Wausau*, 746 F.Supp. 1310, 1324–25 (N.D.Ohio 1990); *Triangle Publications, Inc. v. Liberty Mut. Ins. Co.*, 703 F.Supp. 367, 370–71 (E.D.Pa.1989); *Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159–60 (Minn.Ct.App. 1987).

*Cf. American Home Products Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 764 (2d Cir.1984) (for cases involving exposure to prescription drugs, an "occurrence" is triggered by an actual injury to the body).

**27.** *See Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 765 F.Supp. 881, 885 (D.W.Va.1991) (manifestation of harm occurs on date when insured was notified by EPA that it was a potentially responsible party).

meaning of the term "suit" does not hinge on the form of action taken or the nature of the relief sought, we believe that the Vermont Supreme Court would find that the term encompasses the EPA's claims against Morrisville.[28]

The EPA notified Morrisville that it was a potentially responsible party, and notified Morrisville that it "may be obligated to implement any response action as determined necessary by EPA and may also be liable for all costs incurred by the government in responding to any release or threatened release at the [Rose Chemicals] site." EPA Letter at 1, Dec. 1, 1986. The EPA found that PCBs had contaminated the air, soil, and groundwater at the site, and it was "seeking to determine whether or not [Morrisville would] voluntarily undertake and/or participate in appropriate response actions at the site." *Id.* at 2–3. The EPA explained that Morrisville:

> should notify EPA, in writing, within fourteen (14) calendar days from the receipt of this letter of its commitment to participate in the negotiations and site clean-up process. Failure to respond in the required time will be the basis for the EPA's determination that [Morrisville] declines any participation in the clean-up of the site. *EPA will then proceed with its discussions with other participating potentially responsible parties for complete clean-up of the site and consider use of its enforcement options against [Morrisville].*

*Id.* at 3 (emphasis added). The EPA ended the letter by warning Morrisville that *"[d]ue to the seriousness of the problem at the site and the attendant legal ramifications,* the Agency strongly encourages [Morrisville] to submit a written response within the time frame specified herein. We hope that you will give these matters your immediate attention." *Id.* at 6 (emphasis added).

In *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 693–94, 555 N.E.2d 576, 579–80 (1990), the in-sured received a letter from the EPA which was almost identical to the EPA's letter to Morrisville. The Massachusetts Supreme Judicial Court held that the EPA's letter set forth "a claim of damages on account of property damage," and the letter constituted a "suit" within the meaning of the policy at issue. *Id.* at 695, 555 N.E.2d at 580. Based upon a thorough examination of CERCLA, the court stated that:

> Since the standard policy language was drafted, the EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action. Those requests are dangerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions. The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately. The EPA letter was not the equivalent of a conventional demand letter based on a personal injury claim. [citations omitted].

*Id.* at 695–96, 555 N.E.2d at 581.

Like *Hazen,* the consequences of the EPA's letter to Morrisville was the equivalent of the start of a lawsuit. The EPA clearly warned Morrisville of the probability of imminent government action, enforceable by a court of law, if it did not respond to the letter. The record shows that if Morrisville had not responded to the EPA's demands, then it would have been named as a defendant in the lawsuit now pending in the United States District Court for the Western District of Missouri.

We recognize that some courts have held that a letter from the EPA notifying the insured of its status as a potentially responsible party under CERCLA was *not* a "suit" within the meaning of the policy at issue. *See Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348, 1354 (4th Cir. 1987); *Detrex Chem. Indus., Inc. v. Em-*

---

**28.** *See also C.D. Spangler Constr. Co.,* 326 N.C. at 154, 388 S.E.2d at 570 ("a reasonable person in the position of the insured may not have under-stood the term 'suit' as limiting [the insurer's] duty to defend until a court proceeding had been instigated.")

*ployers Ins. of Wausau,* 746 F.Supp. 1310, 1315 (N.D.Ohio 1990); *Arco Indus. Corp. v. Travelers Ins. Co.,* 730 F.Supp. 59, 68 (W.D.Mich.1989). We decline to adopt this approach for two reasons. First, the fact that another reasonable interpretation of the term "suit" exists simply creates an ambiguity. Under Vermont law, any ambiguity must be strictly construed in favor of Morrisville, not Fidelity.

Secondly, the cases cited above failed to consider the unique aspects of CERCLA. Morrisville had little prospect of avoiding financial responsibility under CERCLA, because liability is not based on fault and the available defenses are very limited. 42 U.S.C. §§ 9607(a), (b). Furthermore Morrisville's potential liability was substantial, because it could be held jointly and severally liable for the *entire* cost of cleaning-up the Rose Chemicals site. *Hazen,* 407 Mass. at 697, 555 N.E.2d at 581. Thus, to protect itself from financial devastation, it was critical for Morrisville to become involved in settlement discussions with the EPA and the Steering Committee.

In addition, any court action by the EPA under CERCLA is limited to the administrative record, and a court can consider only whether the EPA's "decision was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. §§ 9613(j)(1), (j)(2). Therefore, Morrisville's participation in the development of the administrative record was also crucial to protecting its interests. If it had not agreed to actively respond to the EPA's letter, Morrisville could have lost the opportunity to protect its interests well before the EPA brought a lawsuit against it. In other words, Morrisville had no practical choice other than to voluntarily comply with the EPA's demands. Consequently, we find that the EPA's letter to Morrisville was sufficiently coercive and adversarial in nature to constitute a "suit" within the meaning of the CGL policy.[29]

### E. Public Policy

 Finally, Fidelity argues that public policy precludes coverage in this case, because the no-fault, joint and several liability found under CERCLA was "unprecedented and was clearly unforseen when the policy at issue in this action was issued." Fidelity Motion for Summary Judgment at 11. We disagree. In *State of Vermont v. Glens Falls Ins. Co.,* 137 Vt. 313, 319–20, 404 A.2d 101, 105 (1979), the Vermont Supreme Court held that public policy did not preclude insurance coverage for punitive damages. We believe that the Vermont Supreme Court would also find that public policy does not preclude coverage for CERCLA clean-up costs either.

As stated previously, CERCLA clean-up costs are "damages" within the meaning of the policies at issue in this case. These costs are simply compensation for restoring land and water to its natural state. *See AIU Ins. Co.,* 51 Cal.3d at 836, 274 Cal.Rptr. at 841–42, 799 P.2d at 1274–75. Liability for the cost of restoring property to its natural state is hardly unprecedented. These costs have long been recognized as a measure of compensatory damages in common law pollution cases. *Minnesota Mining & Mfg. Co.,* 457 N.W.2d at 183–84.

Moreover, an insurer is not subject to unlimited liability in CERCLA cases, because insurance policies have monetary limits. In addition, the "pollution exclusion" provisions were expressly deleted from both the CGL and the Indemnity policies.

---

**29.** The following courts have also held that letters from the EPA constituted a "suit" within the meaning of a comprehensive general liability policy, if the EPA threatened the use of the legal process to make the insured take action in the clean-up of a hazardous waste site. *See Ryan v. Royal Ins. Co. of Am.,* 916 F.2d 731, 738–39 (1st Cir.1990); *Time Oil v. Cigna Property & Casualty Ins. Co.,* 743 F.Supp. 1400, 1420 (W.D.Wash. 1990); *Ray Indus. Inc. v. Liberty Mut. Ins. Co.,* 728 F.Supp. 1310, 1314 (E.D.Mich.1989); *Centennial Ins. Co. v. Lumbermens Mut. Casualty*

*Co.,* 677 F.Supp. 342, 349–50 (E.D.Pa.1987); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987); *Cf. Avondale Indus., Inc.,* 887 F.2d at 1206 (letter from state agency demanding that the insured clean-up a hazardous waste site or face legal consequences was a "suit" within the meaning of the policy); *C.D. Spangler Constr. Co.,* 326 N.C. at 153–54, 388 S.E.2d at 570 (order from state agency concerning environmental clean-up constituted a "suit" within the meaning of the policies).

*See* Vermont Liability Endorsement Attached to Policies. This indicates that the parties intended for these policies to cover any claims made against Morrisville concerning the discharge or release of pollutants.

Finally, Congress passed CERCLA in 1980 and amended it in 1986. The record shows that the CGL and Indemnity policies were issued by Fidelity from 1983 to 1987. We think it is unlikely that Fidelity was not aware of the risks of CERCLA liability when it issued Morrisville the policies years after CERCLA went into effect. Even if the risk of liability was not specifically known by the parties, "[t]he very title 'Comprehensive General Liability Insurance' suggests the expectation of maximum coverage.... If a risk neither party contemplated develops, the comprehensive policy must necessarily cover that risk. Indeed, protection against unknown risks is the very reason the insured purchases comprehensive liability insurance." *C.D. Spangler Constr. Co.*, 326 N.C. at 152 n. 12, 388 S.E.2d at 569 n. 12, (*quoting*, Note, *The Applicability of General Liability Insurance to Hazardous Waste Disposal*, 57 S.Cal.L.Rev. 745, 757 (1984)).

We believe that public policy is better served if a responsible party, like Morrisville, acts quickly to remedy pollution from hazardous wastes, rather than wait for a judge to order it to clean up the site. *Accord Outboard Marine Corp.*, 570 N.E.2d at 1162. Therefore, we find that coverage for CERCLA clean-up costs does not violate public policy in Vermont.

### III. *Bad Faith*

■ As discussed above, the CGL and Indemnity policies provide coverage for the claims brought against Morrisville concerning the clean-up of the Rose Chemicals site. Morrisville submitted these claims to Fidelity in 1986 and Fidelity denied coverage over two years later. Morrisville contends that Fidelity's denial of coverage "was made in bad faith and with disregard for the terms of the relevant policies and the claims against Morrisville, such that attorneys' fees should be awarded." 1st Amended Complaint at ¶ 42. We agree that Morrisville is entitled to attorneys fees if Fidelity's denial of coverage was made in bad faith.[30] However, a material question of fact exists concerning whether Fidelity's dilatory actions constitute bad faith.

■ An insurer's legal duty is that of a "fiduciary." *Myers v. Ambassador Ins. Co., Inc.*, 146 Vt. 552, 555–56, 508 A.2d 689, 691 (1986). When determining if a third party's claim against an insured is covered under a policy, the insurer must act in good faith, and it must "take the insured's interests into account." *Id.* at 556, 508 A.2d at 691. The insurer must also "diligently investigate the facts and the risks involved in the claim, and should rely only upon persons reasonably qualified to make such an assessment." *Id.*

■ Morrisville argues that the facts clearly show that Fidelity acted in bad faith, because:

[Fidelity] denied coverage over two years after the claims were made against Morrisville and the insured sought defense and indemnification.

[Fidelity's] denial letter ... indicates three grounds for denial. Of these three ... [the defense] of the so-called pollution exclusion clause—was not even available to the insurer [because the clause was expressly deleted from the policies].

[Fidelity] refused to assume the defense of Morrisville when the insurance contract language did not clearly support such a refusal. [citations omitted].

[Fidelity] acted in a wanton and vexatious way and harassed its insured by

---

**30.** *Burlington Drug Co., Inc. v. Royal Globe Ins. Co.*, 616 F.Supp. 481, 483 (D.Vt.1985) (award of attorneys' fees "should be permitted, but only where there is a showing that the insurer's denial was made in bad faith or with vexatious disregard for the terms of the policy or the claims against the insured"); *See also Time Oil Co. v. Cigna Property & Casualty Ins. Co.*, 743 F.Supp. 1400, 1421 (W.D.Wash.1990) ("courts and commentators agree that the damages for a refusal to defend include costs and reasonable attorneys' fees incurred by the insured in defending itself, plus consequential damages stemming from the [insurer's] breach").

filing a duplicative lawsuit in Missouri a month after this case was filed.

Morrisville's Motion in Opposition at 19–20. These facts, if proven, may be adequate to support Morrisville's assertion that Fidelity acted in bad faith. However, the question of whether an insurer acts in bad faith in refusing to defend its insured is generally one for the trier of fact. *Myers*, 146 Vt. at 557, 508 A.2d at 692. This issue only becomes a question of law if a reasonable person could draw but one conclusion from the uncontroverted evidence in the record. *Id.* Such is not the case here.

Fidelity argues that the fact that courts are sharply divided on the issue of coverage for CERCLA clean-up costs and the fact that no precedent exists in Vermont on this issue negate any claim that it acted in bad faith. Fidelity concludes that in "such a murky and shifting area of law, determination of the appropriate course of action is dependent on a difficult process of assessing the viability of legitimate policy defenses weighed against the risks and expense of litigation." Fidelity Motion for Summary Judgment at 14. We would not go so far as to characterize the law on this issue as "murky," but we do agree that the question of whether liability policies cover CERCLA clean-up costs is a complex and widely litigated issue. Consequently, the trier of fact should hear all the evidence before deciding whether Fidelity's decision to deny coverage was made in good faith and was reasonable under the circumstances.

## CONCLUSION

Under the plain meaning of the terms found in the CGL and Indemnity policies, the CERCLA clean-up costs assessed against Morrisville are "damages because of property damage caused by an occurrence." In addition, the EPA's letter to Morrisville is a "suit" within the meaning of the CGL policy. Therefore, Fidelity must defend and indemnify Morrisville for the claims brought against it concerning the clean-up of the Rose Chemicals site, pursuant to CERCLA. However, genuine issues of material fact exist concerning whether Fidelity's denial of coverage was made in bad faith.

ACCORDINGLY, IT IS ORDERED that Morrisville's motion for summary judgment is GRANTED in part and DENIED in part. Fidelity's motion for summary judgment is DENIED. A trial date will be set for Morrisville's claim of bad faith at the court's convenience.