**BRIGGS & STRATTON
CORPORATION,**
Plaintiff,

v.

**ROYAL GLOBE INSURANCE COMPA-
NY, now known as Royal Insurance
Company of America; and Transcon-
tinental Insurance Company, Defen-
dants.**

No. 5:97-CV-569-2(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 23, 1999.

Daniel S. Reinhardt, David C. Vigilante, Brad L. Schoenfeld, Eric A. Szweda, Atlanta, GA, for Briggs & Stratton Corporation, a Wisconsin Corporation, plaintiffs.

Linda B. Foster, Atlanta, GA, Cynthia Ruth Mather, Thomas Tobias Locke, Ross, Dixon & Masback, L.L.P., Washington, DC, for Transcontinental Insurance Company, defendants.

### ORDER

OWENS, District Judge.

In previous order granting the motion of plaintiff Briggs & Stratton ("B & S") for partial summary judgment, the court found that Georgia law applies to construction of an excess coverage liability policy of insurance issued by defendant Transcontinental. We also ruled that under Georgia law remediation conducted by B & S pursuant to a United States Environmental Protection Agency ("EPA") Order, and Notice of Violation of the Georgia Department of Natural Resources Environmental Protection Division ("EPD"), constitutes "damages" under the policy.

Now before the court are cross-motions for summary judgment filed by B & S and Transcontinental. B & S seeks a motion for partial summary judgment as to Count II of its complaint, which alleges a breach of contract against Transcontinental. Transcontinental seeks a partial summary judgment that there is no coverage under the terms of the policy, that Transcontinental did not receive proper notice of the claim, and that the Transcontinental policy layer has not been reached.

### I. Facts

In 1985 B & S closed its manufacturing facility for automotive locking systems located in Perry, Georgia. In the spring and summer of 1985, B & S transferred, for the sum of one dollar, certain electroplating chemicals and other raw chemical substances to Peach Metal Industries, Inc. ("PMI"), in Byron, Georgia, B & S maintains that the chemicals and substances were good and useable substances that were suitable for use in electroplating processes. Several of the materials PMI purchased from B & S were used within days of receiving them.

The electroplating processes engaged in by PMI generated waste waters that contained chemicals. From April of 1978 until approximately September of 1987, PMI discharged untreated waste waters into two unlined surface impoundments at the PMI property, which were discharged through an auxiliary pump into an open vat, then directly onto the property.

In 1987 the EPD began investigating environmental contamination at the PMI site. EPD eventually issued a Notice of Violation finding B & S to be in violation of

Georgia's Hazardous Waste Management Act. On February 12, 1991, the EPA, pursuant to CERCLA[1] §§ 104, 106, and 122, issued Administrative Order No. 91–01–C concluding that hazardous substances were being disposed of at the PMI site and that a number of drums of chemicals substances on the site had been identified as having come from B & S's Perry plant. The EPA ordered B & S, along with the owners of the PMI site and others, to undertake remediation. B & S subsequently spent approximately $5.2 million cleaning up the site.

Royal Insurance Company of America ("Royal") issued a primary insurance policy to B & S for the period April 1, 1985, to April 1, 1986. B & S has agreed to settle its claims against Royal in the present lawsuit. B & S also purchased, through its insurance agent Corroon & Black of Wisconsin, Inc., Transcontinental Commercial Umbrella Liability Policy No. UMB 169 39 31, an excess coverage policy incorporating the provisions of the underlying Royal policy. The policy provided that Transcontinental would pay for loss in excess of the limits of liability of the insurance policy issued by Royal. Corroon & Black arranged for the purchase through the use of an insurance intermediary, sometimes referred to as an insurance wholesaler. The intermediary was known at that time as Pyramid Excess Insurance Brokers, Inc., now Crump E & S of California ("Crump").[2] The use of intermediaries is a common practice in the insurance industry, particularly for the purchase of excess insurance.

## II. Discussion

### A. Summary judgment standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where "the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995).

Under the first element, the issue must be genuine, and the factual dispute must be material to the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Materiality" is determined by reference to the substantive law that controls the case. *Id.; Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 590 (11th Cir.), *cert denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). For a question of fact to be "genuine," the party opposing summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts,' " *Irby,* 44 F.3d at 953 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))—the evidence must be of such a quality that "a reasonable jury could return a verdict for the nonmoving party .... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 248, 249–50, 106 S.Ct. 2505. The second element—that the movant be entitled to judgment as a matter of law—is satisfied where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Policy terms

In this court's previous order granting plaintiff's motion for partial summary

---

**1.** The Comprehensive Environmental Response, Compensation, and Liability Act. 42 U.S.C. § 9601, *et seq.*

**2.** At the time the policy was purchased Crump was known as New Amsterdam Excess of

Illinois, Inc. New Amsterdam Excess had a sister office in California called Pyramid Excess Insurance Brokers, Inc., later known as Crump E & S of California.

judgment, we determined that the policy coverage issues in this case are governed by Georgia law rather than Wisconsin law. To qualify for coverage under the Transcontinental policy, B & S must first show that it has incurred "damages" as a result of "property damage" caused by an "occurrence." These terms are defined in the underlying policy with Royal, in accordance with the following provision in the Transcontinental excess policy:

> **A. Coverage A—Excess Liability Over Underlying Insurance** [Transcontinental] will pay on [B & S's] behalf for loss in excess of the total applicable limits of liability of the underlying insurance stated in the schedule. The provisions of the immediate underlying policy are, with respect to Coverage A incorporated as a part of this policy.

The applicable limits of the underlying insurance with Royal were $1,500,000.00. The provisions of the underlying policy with Royal, which were incorporated into the Transcontinental excess policy, provide:

> **1. Coverage A—Bodily Injury Liability**
>
> **Coverage B—Property Damage Liability**
>
> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A, bodily injury or
>
> Coverage B, property damage to which this insurance applies, caused by an occurrence.

### (1) Damages

This court has already ruled in the previous order that remedial undertakings in response to EPA or state administrative agency orders fit the definition of "damages" under Georgia law. *See Atlantic Wood Industries, Inc. v. Lumbermen's Underwriting Alliance,* 196 Ga.App. 503, 504, 396 S.E.2d 541, 543 (1990), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); *see also Claussen v. Aetna Cas. & Sur. Co.,* 259 Ga. 333, 380

S.E.2d 686 (1989)(EPA-mandated costs incurred by an owner are within the coverage of a comprehensive general liability policy absent a clear and unambiguous pollution exclusion clause). It is undisputed that B & S expended sums in response to the 1991 Administrative Order of the EPA. Such costs fit the definition of "damages" incorporated within the Transcontinental policy.

### (2) Property damage

The underlying Royal policy defines "property damage" as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

PMI conducted electroplating operations at the PMI site during the policy period between April 1, 1985, and April 1, 1986. These electroplating operations involved the discharge of waste waters containing chemical substances into unlined surface impoundments at the property, leading to the environmental damage cited by the EPA order.

In *South Carolina Ins. Co. v. Coody ("Coody I"),* 813 F.Supp. 1570, 1575 (M.D.Ga.1993), a case related to the present one, we outlined several approaches have been adopted by the courts for determining when an injury occurred in cases involving hazardous substances. The Georgia courts and legislature have not decided the question of when environmental damage occurs for the purpose of determining liability in insurance policies. In *Boardman Petroleum, Inc. v. Fed. Mut. Ins.,* 926 F.Supp. 1566, 1577–78 (S.D.Ga. 1995), *rev'd on other grounds,* 150 F.3d 1327 (11th Cir.1998), the district court interpreted contract language similar to that in the Transcontinental policy, relying on elements of Georgia contract law in finding that the most rational interpretation of the

language would support an "exposure" trigger of coverage. *Boardman,* 926 F.Supp. at 1577. Noting that any ambiguities in the contract had to be construed in favor of the insured, the court construed the policy words by their commonly understood meanings and in proper context, noting that the policy failed to use words such as "manifest," "manifestation," "discover," "discovered," or similar words that would indicate a contrary intention. *Id.* at 1577–78. The case was appealed to the Eleventh Circuit, and the question of the trigger of coverage under Georgia law was certified to the Supreme Court of Georgia. The Supreme Court of Georgia did not reach the trigger of coverage issue, but instead resolved the case on the basis of a policy exclusion.[3] *Boardman Petroleum, Inc. v. Federated Mutual Insurance Company,* 269 Ga. 326, 498 S.E.2d 492 (1998).

In *Coody I*, we found that the ultimate result was the same regardless of which of the various approaches was followed. We held that "it is clear that contamination of property by hazardous waste is a physical injury to tangible property." *Coody I*, 813 F.Supp. at 1575. Further, we found that "environmental damage occurs at the moment that hazardous wastes are improperly released into the environment." *Id.* at 1576, quoting *Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co.,* 811 F.2d 1180, 1189 (8th Cir.1987). Thus, environmental damage to the PMI property occurred when electroplating operations involving the discharge of hazardous wastes were discharged onto the PMI property between April 1, 1985, and April 1, 1986.

■ It is not disputed that during the Transcontinental policy period PMI used the chemical materials it purchased from B & S in its electroplating operations, and that as a result of those electroplating operations waste waters containing chemical substances originating with B & S were discharged onto the property, damaging it. We agree with the analysis of the U.S. District Court for the Southern District of Georgia in *Boardman* as to the trigger of coverage issue, and find that the policy language at issue does not specifically require that any property damage be discovered during the policy period. The court finds that the "exposure" trigger of coverage is applicable, and that such exposure occurred during the policy period. Thus, the fact of property damage has been established.

### (3) Occurrence

The underlying Royal policy defines an "occurrence" as

[A]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The underlying policy also contains the following exclusionary clause, which excludes from the definition of property damage:

property damage arising out of the discharge, dispersal, release or escape of

---

**3.** In doing so the Georgia court reviewed the following principles of Georgia contract law, which this court is required to follow:

"Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. *Park 'N Go v. U.S. Fidelity,* 266 Ga. 787, 791, 471 S.E.2d 500 (1996). Three well known rules ... apply. Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations

of the insured where possible' (citations omitted). *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615(1), 299 S.E.2d 561 (1983). Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent. *Park 'N Go, supra* at 791, 471 S.E.2d 500. The contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others. *McCann v. Glynn Lumber Co.,* 199 Ga. 669, 34 S.E.2d 839 (1945)." *Boardman,* 269 Ga. 326, 498 S.E.2d at 494.

smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Thus, only property damage caused by the release of contaminants that is not sudden and accidental is excluded from coverage under the Transcontinental policy.

■ Transcontinental argues that the damage to the PMI property was not an occurrence because it did not fit the policy definition of an "accident." B & S arranged for the sale or disposal of hazardous substances by shipping barrels of chemicals to the PMI plant. The arrangement for sale or disposal of the hazardous substances was intentional rather than accidental. Thus, Transcontinental argues that the property damage to the PMI property was not an occurrence under the policy definition from the standpoint of B & S.

The reasoning espoused by Transcontinental was rejected by the district court in *Village of Morrisville Water & Light Dept. v. United States Fidelity & Guar. Co.*, 775 F.Supp. 718 (D.Vt.1991). There, the utility company, Morrisville, sent hazardous materials containing polychlorinated biphenyls ("PCBs") for disposal to a site that had been approved by the EPA for disposal of PCBs. The owner of the site failed to properly treat, store, or dispose of the materials, and eventually abandoned the site leaving behind contaminated soil and water. Consequently, the EPA notified Morrisville that it was a potentially responsible party under CERCLA. Morrisville entered into a "Consent Party Agreement" with the EPA (and a steering committee composed of other po-

tentially responsible parties), by which it paid \$15,920.00 for its allocated share of the clean-up costs and remained liable for additional costs.

Morrisville notified Fidelity, the insurance company, of the EPA's claim against it. Fidelity denied coverage, arguing, *inter alia*, that no "occurrence" was triggered under the policy. *Morrisville*, 775 F.Supp. at 724. The district court found that under Vermont law an accident, or "unexpected happening," was the harm that occurred rather than the act causing the harm, so that an intentional act could constitute an "occurrence" if the harm that resulted from the act was not expected or intended by the insured.[4] *Id.* at 729–30. The court found:

> In the present case, Morrisville intentionally sent PCB-contaminated material to the ... site. However, this intentional act does not negate coverage, because Morrisville neither expected nor intended to damage the site. Moreover, the harm in this case happened after the material reached the site. The EPA certified the site as a legal disposal site for PCB-contaminated material. Morrisville, along with many other utility companies, relied upon this certification. the harm occurred because of the improper and illegal disposal of the hazardous material at the site. Because the improper disposal was an "accident" which resulted in property damage neither expected nor intended by Morrisville, an "occurrence" happened within the meaning of the ... policies.

*Id.* at 730. In the instant case there is not, as in *Morrisville*, the element of reliance upon the EPA's certification of the PMI site as a legal disposal site. However, in each case the potentially responsible party intentionally transported hazardous substances for sale and/or disposal, resulting

---

4. Under Vermont law, an "accident or unexpected event" is an "unexpected happening without intention or design." *Morrisville*, 775 F.Supp. at 729. Similarly, under Georgia law an accident is "an event which takes place without one's foresight or expectation or de-

sign." O.C.G.A. § 1–3–3(2), or "an unexpected happening rather than one occurring through intention or design." *Allstate Ins. v. Grayes*, 216 Ga.App. 419, 421, 454 S.E.2d 616 (1995).

in unexpected and unintended property damage. Thus, the reasoning of *Morrisville* is persuasive.

■ Moreover, in *Claussen v. Aetna Casualty & Surety Company,* 259 Ga. 333, 380 S.E.2d 686 (1989), the Supreme Court of Georgia considered an exclusionary clause identical to the one at issue in the present case, construing the provision "but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." Noting that "sudden" had more than one possible meaning, the court utilized Georgia rules of construction and upheld the meaning favoring the insured, which is "unexpected." *Claussen,* 380 S.E.2d at 688. From the standpoint of B & S, PMI's discharging the waste products into unlined lagoons was unexpected and unintentional. Thus, the exclusionary clause does not negate coverage under the facts of the present case.

### C. Notice requirement

Part VI of the Transcontinental policy contains the following two notice provisions:

**Your Duties in the Event of an Occurrence that Has Not Resulted in a Claim or Suit**

Whenever you have information of an Occurrence which involves injuries or damages reasonably likely to involve this policy, written notice shall be given by or for the insured to us or to any of our authorized agents as soon as practicable....

. . . .

Failure to notify the company of an Occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to involve it, shall not prejudice coverage.

**Your Duties in Event of Claims or Suit**

Immediate written notice shall be given by the Insured to us whenever:

1. A claim is made or suit is brought against the Insured;

2. The Insured receives notice that a right to bring a claim or suit against the Insured will be asserted;

. . . .

Every demand, notice, summons, amended complaints or other process received by the insured or a representative of the Insured shall be forwarded with each notice.

By letter to counsel for B & S dated December 20, 1988, counsel for T.A. McCord, an owner of the PMI site, requested B & S to remove the hazardous materials that it had transferred to the site. The letter stated:

While this letter is not intended to be a demand but a request for your voluntary cooperation, please understand my client's position. If Briggs will not voluntarily remove their materials, we believe that Briggs can be held liable under Section 107(a)(3) of CERCLA as a person who "arranged" for the "treatment" of a hazardous substance at a site where hazardous substances exist now and where there is a release or substantial threat of a release of a hazardous substance.... We do not believe that Briggs can take the position that the transaction is not subject to CERCLA liability.

On January 17, 1989, counsel for B & S responded that plaintiff had investigated the matter and that it would not participate in cleaning up the PMI site. By letter dated January 24, 1989, the owner's counsel wrote a second letter stating that:

It is clear that the price paid is not indicative of a sale but rather an arrangement for treatment of the chemicals. To establish liability under CERCLA, I do not need to show that Briggs arranged for disposal, only that Briggs arranged for treatment of a hazardous substance which is still present in the site from which hazardous substances either have been or may be released. I can prove these facts and establish CERCLA liability.... Briggs' unwillingness to participate in a volun-

tary removal will only increase its liability for this matter. I recommend that your client reconsider its position. I can assure you that my client will not accept Briggs' position.

In April of 1990 counsel for the PMI site owner forwarded to counsel for plaintiff an affidavit signed in 1989 by Alvin E. De-Graw, Jr., the owner and president of PMI, in which DeGraw alleged numerous acts of wrongdoing by B & S. In his affidavit, DeGraw stated, "I have been asked to provide this affidavit with the understanding that it may be used in a lawsuit between Concrete Sales, Inc., and the Briggs & Stratton Corporation."[5] During 1990 counsel for B & S investigated the allegations, began negotiating with the PMI site owners regarding its responsibility to participate in the cleanup, and retained an environmental consulting firm. Representatives of B & S traveled from Wisconsin to the PMI site on three occasions in November and December of 1990 and created an inventory of substances potentially attributable to B & S. In November of 1990 B & S also began negotiations with the EPA regarding its responsibilities for the cleanup.

In December of 1990 the EPA issued a "Notice of Potential Liability and Offer to Negotiate for Removal Action," which named B & S as a potentially responsible party at the PMI site and informed B & S that if it did not contact EPA to participate willingly in the draft Administrative Order B & S could be issued an investigative order under § 107 of CERCLA. Finally, on February 12, 1991, the EPA issued its Administrative Order directing B & S and the PMI site owners to present EPA with a series of work plans regarding clean of the site and then to institute cleanup with a certain time period.

In May of 1991 B & S, through its agent Corroon & Black, sent written notice of a claim under the Transcontinental policy to Crump E & S of Illinois. The typical

manner in which this had been accomplished in the past was that Corroon & Black, as the agent of B & S, would send notices of claims to Crump of Illinois (formerly New Amsterdam Excess). Crump would forward the claims to its California office (formerly Pyramid Excess), and the California office would forward them to Transcontinental. In this instance, however, Transcontinental denies that it received notice of the claim from Corroon & Black. Transcontinental does not acknowledge receiving notice of the claim until March of 1996, seven years after B & S received the first letter referring to the problems at the PMI site.

### (1) Duty to provide notice, 1988–1990

As recited above, the Transcontinental policy provided that "[f]ailure to notify the company of an Occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to involve it, shall not prejudice coverage." Thus, B & S argues that it was not required to give notice to Transcontinental for every occurrence, but only when it learned of an occurrence that could implicate the excess insurance provided by Transcontinental. B & S maintains that there is no evidence that it believed during the early stages of its investigation of the contamination at the site that its liability would be in excess of the sum of $750,000.00; thus, there was no obligation to notify the excess insurance carrier.

Transcontinental argues that the December 1988 and January 1989 letters from the owners' counsel clearly asserted "a right to bring a claim" as that term is used in the policy, and notes that B & S's Director of Risk Management testified that the January 17, 1989 letter "appears to be a major dispute as to whether or not [B & S] had any liability or involvement in this...." The Director of Risk Management further stated that had he seen the

---

**5.** The owners of the PMI property incorporated Concrete Sales, Inc., and transferred ownership of the property into the corporation.

December 1988 and January 1989 letters he would have sought legal advice regarding whether to give notice to the insurance carriers of the letters.

In *Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 860 (11th Cir.1997) the Court of Appeals construed an excess insurance policy which provided:

> [Insured] shall immediately give to [insurer] written notice directed to Shand, Morahan & Company, Inc., 1 American Plaza, Evanston, Illinois, of an occurrence, claim or suit which is reasonably likely to involve [insurer] under this policy.

*Evanston* involved an automobile accident resulting in a death. Notice was given to the primary insurance carrier but not to Evanston, an excess carrier. A wrongful death suit was filed and eventually went to a jury. The lawyers who had conducted the defense throughout the case had evaluated the case at less than $3.5 million. However, the jury returned a verdict totaling $23.2 million, including punitive damages (the case was settled for $7.5 million at the start of a second trial after the trial judge set aside the wrongful death award as being excessive). Evanston took the position that it did not owe coverage because it had not received timely notice of the claim. The Court noted that excess carriers are generally not interested in every accident, but only those likely to involve the policy. Because such a large verdict was not reasonably likely, and because the insured had exercised due diligence and based its evaluation of the claim on advice from competent attorneys, the failure to give earlier notice to Evanston was reasonable as a matter of law. *Id.* at 862.

In construing the policy language that required notice whenever excess coverage involvement was "reasonably likely," the Court found:

> This phrase, though susceptible of different meanings, clearly contemplates that the insured is not required to give notice every time there is a claim against it. Nor does the policy require notice upon the mere possibility that the excess will be involved. *If this were intended, the policy would simply require notice of all claims against the insured.* [Emphasis added].

*Evanston*, 111 F.3d at 860. The notice clause in *Evanston* required the insured to provide notice of an "occurrence, claim or suit which is reasonably likely to involve [insurer] under this policy" (emphasis added). By contrast, the instant case contains two separate notice provisions. The first provision requires B & S to notify Transcontinental or its authorized agent of an occurrence, notwithstanding the fact that it has not resulted in a claim or suit, that is reasonably likely to involve the policy. The first notice provision specifically states that "failure to notify the company of an Occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to involve it, shall not prejudice coverage." The argument that B & S had reasonably believed that the claim against it would not exceed $750,000.00 therefore applies only to its duty to notify Transcontinental of an occurrence that has not resulted in a claim or suit. We need not reach the issue of the reasonableness of B & S's assumption that the PMI claim would not involve the Transcontinental policy, however, because of the wording of the second notice provision in the policy.

■ At the point when a claim or suit is at issue, the second notice provision comes into play. In distinction to the policy involved in *Evanston*, the Transcontinental policy does not contain limiting language requiring notice of only a claim or suit "reasonably likely to involve [the insurer]." Instead, it requires immediate written notice whenever either a claim is made or suit is brought against the insured, or when the insured receives notice that a right to bring a claim or suit against the insured will be asserted. By its language the policy clearly requires notice of all claims or assertions of the right to bring a

claim against the insured, regardless of whether the claim appeared likely at that point to involve the excess insurance policy. *Cf. Evanston,* 111 F.3d at 860.

■ The letters B & S received from counsel for the PMI property owners in 1988 and 1989 constituted "notice that a right to bring a claim or suit against the insured will be asserted." Although counsel indicated that his letter did not constitute a demand and that he sought voluntary cooperation from B & S, he made it clear in both the 1988 letter and the 1989 letter that the owners intended to pursue their remedies under CERCLA.[6] The likelihood of a lawsuit was made more apparent in April of 1990 when counsel for the PMI site owner forwarded to B & S the 1989 DeGraw affidavit. Actions taken by representatives of B & S by this point indicate that they took the possibility of a lawsuit seriously. Nevertheless, B & S did not attempt to notify Transcontinental of the claims against it until May of 1991, thirteen months after receiving the third of three documents indicating that the owners intended to establish liability under CERCLA. A delay of this length in giving notice is unreasonable as a matter of law. *See South Carolina Insurance Company v. Coody,* 957 F.Supp. 234, 238–39 (M.D.Ga.1997)("*Coody II*"), citing *Richmond v. Georgia Farm Bureau Mutual Insurance Co.,* 140 Ga.App. 215, 231 S.E.2d 245, 249 (1976), and *Snow v. Atlanta International Insurance Co.,* 182 Ga. App. 1, 354 S.E.2d 644 (1987).

### (2) Attempted notice in 1991

Even if the letters to B & S in 1989 and 1990, along with the DeGraw affidavit, did not constitute notice of a claim which triggered the obligation to notify Transcontinental under the terms of the policy, the court further concludes that B & S did not provide adequate notice to Transcontinental after it received the 1991 EPA Administrative Order.

■ The Transcontinental policy required that notice "shall be given ... to us or to any of our authorized agents." B & S argues that it satisfied its notice obligations under the policy by sending notice of claim through its agent, Corroon & Black, to Crump of Illinois in May of 1991. In Georgia, "independent insurance agents generally are considered agents of the insured, not the insurer, absent evidence that the insurer granted the independent agent authority to bind coverage on the insurer's behalf." *Kinard v. National Indemnity Company,* 225 Ga.App. 176, 483 S.E.2d 664, 666 (1997), *aff'd,* 269 Ga. 266, 496 S.E.2d 705 (1998); *Kirby v. Northwestern Nat. Cas.* Co., 213 Ga.App. 673, 678, 445 S.E.2d 791 (1994). *Morstein v. National Ins. Services, Inc.,* 93 F.3d 715, 717 n. 2 (11th Cir.1996); *European Bakers, Ltd. v. Holman,* 177 Ga.App. 172, 338 S.E.2d 702, 704 (1985), *cert. denied* 1986. In *Southeastern Express Systems, Inc. v. Southern Guaranty Insurance Company of Georgia,* 224 Ga.App. 697, 482 S.E.2d 433 (1997), the independent insurance agent or broker was found to be the agent of the insured, so that notice to the independent agent did not constitute notice to the insurer; *see also Strickland v. American Home Assurance Co.,* 186 Ga.App. 425, 367 S.E.2d 241 (1988).

B & S argues that Georgia law does not apply in the instant case because there were four entities involved: B & S, Corroon & Black, Crump, and Transcontinental. It cites general principles of agency law to show that an agency relationship can arise when a principal, through its course of conduct, holds out a person as its agent and causes others to rely on the

---

6. B & S argues that the letters did not trigger the duty to provide notice because the claims at issue in this lawsuit did not result from the original claims of the owners. This argument is not convincing. The owners of the PMI property were being focused on by the EPD and EPA and consequently were looking for

other parties to share responsibility for the clean-up costs. The owners asserted their right to bring a claim under CERCLA even though ultimately it was the EPA who ordered B & S to take part in the clean-up pursuant to CERCLA.

existence of the agency. *See, e.g., Ampex Credit Corp. v. Bateman*, 554 F.2d 750, 753 (5th Cir.1977); *Kirby v. Northwestern National Casualty Co.*, 213 Ga.App. 673, 445 S.E.2d 791 (1994).

B & S states that on twenty-three previous occasions it had notified Transcontinental of potential claims under the policy by forwarding notices to Crump. Transcontinental never informed B & S before the present lawsuit that notice to Crump was insufficient under the policy. Several times Crump would forward B & S's notice of claim to its San Francisco office addressed to "Transcontinental Ins. Co." or "Transcontinental Ins. Co. c/o Crump E & S," and B & S was never notified that this was inappropriate. As further evidence of agency, B & S argues that Transcontinental limited brokers' abilities to contact it to a fixed number of intermediaries, and that retail insurance agents such as Corroon & Black routinely send their insured's notices of claims to the intermediary that placed the policy rather than directly to the insurer carrier. A representative of Corroon & Black testified that in her 17–year tenure with that company no intermediary had ever informed her that notice to an unauthorized intermediary of the insurance carrier does not constitute notice to the carrier. B & S states that Crump led Corroon & Black to believe that the only way B & S could contact Transcontinental was through Crump.[7]

On the other hand, it is undisputed that neither Crump nor Transcontinental had ever notified B & S either orally or in writing that Crump was its agent. A representative of Crump testified that in sending notice of claims to Transcontinental, Crump was acting on behalf of its client, Corroon & Black. Further, Crump did not work just for Transcontinental. During the same policy period at issue in this case Crump had placed excess insurance for B & S with a number of different insurance companies. Both the Georgia courts and the Eleventh Circuit have held that an independent insurance agent was not an agent of the insurer when the insurer was only one of a number of insurance companies with which it placed insurance. *State Automobile Mut. Ins. Co. v. Horne*, 794 F.2d 621, 624 (11th Cir.1986); *Kirby v. Northwestern Nat'l Cas. Co.*, 213 Ga.App. 673, 445 S.E.2d 791 (1994). Finally, Crump did not have authority from Transcontinental to bind coverage on behalf of Transcontinental.

Admittedly, Transcontinental never complained to either B & S or Corroon & Black of the inadequacy of notice when Corroon & Black sent previous notices of claims to Transcontinental through Crump. Transcontinental argues that because it actually received notices of claims on these prior occasions, it had no reason to complain that the claims were forwarded to it by Crump. Transcontinental denies that it received notice of the present claim relating to the PMI site until 1996, and B & S has produced no material evidence to suggest that notice was actually received and misplaced.

 B & S has failed to establish that Georgia caselaw relating to independent insurance agents is not applicable to insurance intermediaries or wholesalers engaged in procuring excess insurance. Moreover, insufficient facts have been presented to overcome the presumption that Crump was not the agent of Transcontinental. The facts that Crump was engaged in placing policies for a number of different carriers, and that it did not have authority to bind coverage for Transcontinental, demonstrate a lack of agency between Crump and Transcontinental under Georgia law. Therefore, notification to Crump of the claim regarding the PMI property in May of 1991 was not the equivalent of notification to Transcontinental.

7. B & S also apparently contends that neither it nor Corroon & Black knew how to contact Transcontinental directly. However, the facts show that the Director of Risk Management for B & S met with a Transcontinental representative in the Fall of 1991 and that B & S contacted Transcontinental on other occasions. The court finds unconvincing the statement of B & S that it did not know how to contact Transcontinental directly.

As we stated in *Coody II*, "[t]he purpose of a notice provision in an insurance policy is to enable an insurer to investigate promptly the facts surrounding the occurrence while they are still fresh and the witnesses are still available, to prepare for a defense of the action, and, in a proper case, to determine the feasibility of settlement of the claim." *Coody II*, 957 F.Supp. at 237, quoting *Richmond v. Georgia Farm Bureau Mutual Insurance Co.*, 140 Ga.App. 215, 231 S.E.2d 245, 250 (1976). By failing to insure that Transcontinental received notification under the terms of the policy, B & S denied Transcontinental these benefits.

In summary, the court finds that the Transcontinental policy of excess insurance provided coverage for the damages incurred by plaintiff B & S as the result of property damage at the PMI site. However, we further find that B & S failed to provide adequate notice as required under the policy. Consequently, Transcontinental is not liable under the policy.

### *IV. Conclusion*

For the reasons above stated, the motion of defendant Transcontinental for summary judgment is **GRANTED.** The motion of plaintiff B & S for partial summary judgment is **DENIED.**