**NORTH RIVER INSURANCE COMPANY, Plaintiff,**

v.

**GIBSON TECHNICAL SERVICES, INC., Defendant and Third–Party Plaintiff,**

v.

**BB & T Insurance Services, Inc., Third–Party Defendant.**

**Civil Action File No. 1:13–CV–1505–MHS.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed Dec. 29, 2014.

Kim M. Jackson, Bovis, Kyle, Burch & Medlin, LLC, Matthew George McLaughlin, McLaughlin & Loring, Atlanta, GA, for Plaintiff.

George E. Duncan, Jr., Dennis Corry Porter & Smith, LLP, Atlanta, GA, for Defendant and Third–Party Plaintiff.

Joel G. Pieper, John Gregory Perry, Womble Carlyle Sandridge & Rice, LLP, Atlanta, GA, for Third–Party Defendant.

## ORDER

MARVIN H. SHOOB, Senior District Judge.

Before the Court are North River Insurance Company's (North River) and Gibson Technical Services, Inc.'s (Gibson) cross-motions for summary judgment and BB & T Insurance Services, Inc.'s (BB & T) motion for summary judgment. The Court's rulings and conclusions are set forth below.

*Introduction*

The following facts are not in dispute, unless noted otherwise. Gibson is a telecommunications systems contractor. During 2007, it contracted with Comcast to perform services in Florida. Gibson subcontracted with Pheckvision, Inc. (Pheckvision), which subcontracted with Boz Cable Services, LLC. (Boz), to perform the work for Comcast.

BB & T is an independent insurance agency that has worked with Gibson since 2004–05. It helped Gibson with its placement in a self-insured, captive insurance program, Affinity, which provided primary commercial general liability coverage. Affinity used Gallagher Basset, a third-party administrator, and Gibson reported its claims for primary automobile and commercial general liability coverages to Gallagher Basset. In 2005, BB & T placed Gibson's excess coverage with North River, a Crum and Forster Company. North River issued to Gibson an umbrella liability policy with an aggregate limit of five million dollars. In rele-

vant part, the policy agreement imposed the following requirements:

### G. Duties in the Event of Occurrence, Claim or Suit

1. You must see to it that we are notified of any "Occurrence" which may result in a claim or "Suit" under this policy. To the extent possible notice should include:

    a. How, when and where the "Occurrence" took place;

    b. The name and address of any injured persons and witnesses; and

    c. The nature and location of any injury or damage arising out of the "Occurrence."

. . .

2. If a claim is made or "Suit" is brought against any insured that is likely to involve this policy, you must:

    a. Immediately record the specifics of the claim or "Suit" and the date received; and

    b. *See* to it that we are notified as soon as practicable. . . .

. . .

3. You and any other involved Insureds must:

    a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with any claim or "Suit."

. . .

Doc. 74–7.

Each year, BB & T entered into written "Brokerage Service Agreements" with Gibson. Among other things, the agreements required BB & T to provide the following risk management services to Gibson:

A. Work with the Client to assess the Client's risks;

B. Work with the Client to design and develop the Client's insurance program;

C. Keep the Client informed of significant changes and/or trends in the insurance marketplace and provide the Client with an annual forecast of market conditions;

D. Meet regularly, on a prescheduled basis with the Client's key people designated by the Client to discuss strategy and open items;

E. Review Client's loss control programs for adequacy and effectiveness. . . .

On June 23, 2007, Boz's employee, Eric Bozorth (Bozorth), when traveling home from work, struck a car with four passengers in St. Lucie County, Florida. The accident caused serious injuries to the passengers, premature birth, and a subsequent death of Gretchen Dawson's infant child. Shortly thereafter, Gibson learned that Bozorth was hurt in an accident, but did not investigate it further.

Nine months after the accident, the Dawson and the Steffen families sued Bozorth, Boz, and Comcast.[1] On June 24, 2008, Comcast's counsel, Rudd & Diamond, P.A., sent a certified letter to Gibson demanding defense and indemnity, and enclosed the police report of the accident and the complaint. Comcast's counsel Peter Diamond also demanded that Gibson inform its insurance and excess insurance carriers about the lawsuit. Gibson's Chief Financial Officer, Robert Moore, who was overseeing the claim, instructed BB & T not to notify either of its insurance carriers because the lawsuit involved a subcontractor of a subcontractor. According to Moore, his understanding was that Pheckvision's insurance would be handling the matter, although he did not personally speak with Pheckvision or Gibson's project manager in Florida. According to Moore, "[s]omeone from [Gibson] may have talked to [Pheckvision] to find out about the acci-

---

1. The Court will refer to the Dawsons' and the Steffens' lawsuit as the Dawsons' lawsuit.

dent." Moore depo. at 31. The contract between Pheckvision and Gibson, specifying Pheckvision's obligations, was never located. Moore acknowledged that in 2008 he realized that Gibson could be added as a defendant to the lawsuit. However, Gibson did not seek legal advice in 2008, and no one at Gibson looked at the umbrella policy contract until the spring of 2013.

On October 8, 2008, Comcast's counsel sent another letter to Gibson demanding indemnity and defense. He also sent this letter to BB & T and Affinity. Gibson and BB & T dispute who, and under what circumstances, reported Comcast's demand to Gallagher Bassett on October 15, 2008. However, it appears that Kenneth Borders, Gibson's fleet safety manager, reported the claim after Moore asked him to do so. Apparently Moore made this decision after consulting with a BB & T representative. Moore did not give any documents to Borders and provided only "information to indemnify Comcast and the date of the incident." Borders depo. at 13. Borders reported the claim via an on-line system. After reporting the claim, Borders "was just trying to figure out when and where" the accident occurred. *Id.* He asked Jim O'Dell, Gibson's project manager in Florida, to provide the details about the accident. However, the accident description that Borders received from O'Dell's subordinate "was a little fuzzy" and "missing words," and "[i]t was [in] broken English." *Id.* at 13–14. Borders also communicated with Pheckvision in an effort to locate the indemnity agreement.

At Gallagher Bassett, the claim was assigned to Tammy Morrison, Gallagher Bassett's Senior Claims Representative. On October 21, 2008, Morrison created a claim report establishing a $5,000 reserve for coverage of counsel's costs, and an indemnity reserve of $1,000. She noted that Gibson's liability was doubtful. For three years, indemnity reserves remained at the token levels but the expense reserves for attorney fees continued to grow. However, Gallagher Bassett reports of zero liability were based on Gibson's representations that Pheckvision would absolve it from liability.

Because of its relationship with Gibson, BB & T would have warned Gibson in writing if it thought that Gibson was violating terms of its insurance policies. Each year, BB & T prepared and submitted the applications for excess insurance coverage on behalf of Gibson. The renewal applications asked for a description of any claims or occurrences over $10,000. In the application process, North River's underwriter asked BB & T to provide the details of any losses valued at over $25,000. BB & T did not notify North River about the underlying claim even when the expense reserves estimated by Gallagher Bassett increased well beyond these sums over the years.

At some point, Moore asked Borders to obtain an indemnity contract between Gibson and Pheckvision. However, on January 9, 2009, Borders informed Morrison at Gallagher Bassett that he could not find the contract, but advised her that "they [would] be okay when it comes out [that] the driver was on his way home, in his own personal truck, outside of their service area when the accident occurred." *Id.* at 22.

In July 2009, Gibson and Pheckvision were added to the lawsuit. On July 14, 2009, Gibson retained legal counsel, John Luvrey with the Conroy Simberg law firm. On July 21, Luvrey sent a letter to Moore advising, among other things, to "immediately give notice to the excess carrier." Doc. 75–1, Exh. 69. Gibson disregarded counsel's advice. However, in relation to this litigation, Luvrey submitted a sworn affidavit stating that he provided the same

initial advice to all his clients because it was "good practice for clients to follow." Doc. 75-1 at 3. Luvrey further stated that prior to sending that letter, he had not analyzed Gibson's exposure. On August 6, 2009, Luvrey produced a more detailed report, where he opined that Gibson's exposure was low, recommended defending the case, but noted that the damages could range between three to five million dollars.

On October 16, 2012, the court denied Comcast's motion for summary judgment, and Gibson's motion was denied one month later. North River learned about the accident and the underlying lawsuit from Comcast's counsel on November 16, 2012. BB & T also reported the claim to North River. In June 2013, the case was settled, and North River contributed two million dollars to the settlement in exchange for the right to litigate the current case.

North River seeks declaratory judgment against Gibson. The parties filed cross motions for summary judgment. In addition, BB & T filed a motion for summary judgment against Gibson.

*Parties' Contentions*

A. North River's Motion for Summary Judgment

North River claims that Gibson failed to timely notify it about the accident, Comcast's indemnity claim, and the lawsuit, in violation of the policy provisions. According to North River, Gibson was required to notify it as soon as reasonably possible, which Gibson failed to do. It further contends that Gibson's excuses for not providing a timely notice are objectively unreasonable. Thus, it argues, Gibson is not entitled to coverage under the policy.

Gibson responds that it reasonably believed that the excess insurance coverage would not be needed until the trial court denied Comcast's motion for summary judgment in October 2012. It asserts that when it first heard about the accident in June 2007, it was only in the context that Bozorth would miss work. Thus, Gibson contends, it had no reason to believe that it was involved in the accident. It further reasons that when it received a copy of the lawsuit, demand for indemnity, and a request to notify the insurance carriers in June 2008 from Comcast, it was not named in the lawsuit, thus, it "did not see that it was involved," and "felt that the subcontractor would be handling the matter." Doc. 142 at 3. Gibson also claims that when Comcast resubmitted its request for coverage in October, Gallagher Basset assessed Gibson's liability as doubtful, setting token reserves of $1,000 for bodily injury and $5,000 for expenses. Thus, Gibson argues, it reasonably believed that the excess policy would not be triggered. Further, when Gibson was added to the lawsuit in July 2009, its counsel between the fall of 2009 and 2012, continued to opine that Gibson's exposure was low. According to Gibson, only when Comcast's motion for summary judgment was denied did it become reasonably likely that the excess coverage would be needed.

BB & T also responds to North River's motion and contends that the excess policy coverage is not triggered until the liability limits of the primary coverage have been exhausted. It argues that under Georgia law, there is a difference between notice provisions to excess liability and to primary liability insurance providers. According to BB & T, plaintiffs' vicarious liability theory was questionable, thus, Gibson did not think that their claims were likely to involve the umbrella policy. BB & T further argues that under North River's interpretation of the policy, even meritless claims alleging amounts in excess of the primary policy coverage must be reported. However, it contends that obviously weak claims cannot be deemed likely to involve the excess policy, and thus, North River's reasoning is erroneous. BB

& T advances the same argument concerning notice requirements about lawsuits. Next, with regard to the notice about an "occurrence," BB & T contends that because the policy did not specify when the notice should be given, Gibson did not violate this clause. It also claims that if an insurance policy is susceptible to more than one construction, the one most favorable to the insured must be adopted.

North River replies to Gibson's and BB & T's responses and contends that like all insurance provisions, the notice provision at issue must be interpreted under the ordinary rules of contract construction. And notice provisions in primary and excess policies are interpreted identically. North River relies on *Briggs & Stratton Corp. v. Royal Globe Ins. Co.,* 64 F.Supp.2d 1346 (M.D.Ga.1999), involving the interpretation of a late notice provisions in an excess policy. There, one of the notice provisions required the insured to immediately provide notice when a claim was made or a lawsuit was initiated against the insured, regardless of whether it was reasonably likely to involve the excess policy. *Id.* at 1354. The insured delayed in providing notice of a claim for thirteen months. *Id.* at 1355. The court noted that the policy clearly required notice of all claims. Thus, the court, relying on a case interpreting a primary insurance policy with the requirement to provide notice "as soon as practicable," concluded that a thirteen-month delay was unreasonable as a matter of law. *Id.* North River also contends that Gibson failed to diligently evaluate its potential exposure and did not rely upon the advice of competent attorneys.

### B. Gibson's Motion for Summary Judgment

Gibson argues that it did not violate the policy's notice provisions. It claims that it reasonably believed that the excess policy would not likely be triggered until Com-sat's motion for summary judgement was denied. Gibson contends that even though the crash injuries were severe, all of the parties involved in the handling and evaluation of the lawsuit opined that Gibson would not be held liable. Specifically, it claims that its counsel assessed the chances of liability as remote, the claims manager for the primary carrier posted only minimal reserves for potential damages, the third-party administrator handling the file opined that it was a no liability case, and the insurance broker agreed with this assessment. Gibson further contends that North River conceded that it has not been prejudiced by the fact that the claim was first reported when it was. Next, it contends that the policy must be interpreted according to its terms, and unless the insured's determination whether the claim was likely to involve the excess policy was manifestly unreasonable, Gibson's assessment controls. In support of this contention, Gibson relies on *Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.,* 111 F.3d 852 (11th Cir.1997); *Lumbermens Mut. Casualty Co. v. Plantation Pipeline,* 214 Ga.App. 23, 447 S.E.2d 89 (1994); and *Plantation Pipe Line Co. v. Cont'l Cas. Co.,* No. 1:03–CV–2811–WBH, 2006 WL 6106248 (N.D.Ga. Sept. 25, 2006). In addition, Gibson notes that North River had notice of the occurrence for seven moths before it paid the claim. Gibson also contends that it would be unreasonable to interpret the policy as requiring it to notify North River of all occurrences that may result in a claim or a lawsuit. Finally, Gibson argues that even if it violated the notice provisions, North River's claim for breach of contract fails because it suffered no damages. It contends that North River admitted that the settlement amount it paid was reasonable, did not argue that it paid more that it should have because of the untimely notice, and failed to show that it would had done anything

differently if it had received an earlier notice.

In a consolidated response North River asserts that Gibson violated three separate notice provisions.[2] With regard to the "Occurrence" notice, North River contends that the plain language of the provision supplies a timeliness requirement. And even if it does not, according to North River, under Georgia law, Gibson was required to provide notice within a reasonable time. North River asserts that this notice requirement was triggered when Gibson learned about the accident in June 2008. It further argues that an un-excused multiple-year delay is unreasonable as a matter of law, and accepting Gibson's reading of the "Occurrence" provision, i.e., that notice could be provided at any time, would render the provision pointless. Further, with respect to notice of a claim or a lawsuit, North River asserts that Gibson's reliance on *Evanston, Lumbermens*, and *Plantation Pipe Line* is misplaced. There, the insureds were not advised by their lawyers to provide notice to the excess carriers; instead they reasonably believed that the damages would not exceed the primary policies. North River further argues that under *Evanston*, Gibson violated the policy provisions on two occasions-by failing to provide notice of Comcast's June 2008 demand and of being added as a party defendant in July 2009. Moreover, North River argues that Conroy Simberg's advice that Gibson should not be liable was based on Gibson's representation that it had an indemnity agreement with Pheckvision. North River asserts that to this date the agreement with Pheckvision has not been located. It also argues that Gibson could not have relied on Gallagher Bassett's reserve amounts, since they remained low months after Comcast's motion

for summary judgment was denied. Finally, North River contends that under Georgia law an insurer does not have to show prejudice from late notice.

Gibson replies and agrees with North River that rules of construction are applied only if the contract is ambiguous. However, it first asserts that after determining the parties' intent, which is to provide Gibson coverage for losses exceeding the primary coverage, the words are to be given their ordinary meaning concerning the notice provisions. And the plain meaning of the provisions is that the insurer must be notified only if the excess policy is likely to be implicated. Thus, according to Gibson, because it notified North River when it "became apparent" that the excess policy might be involved, i.e., after denial of Comcast's motion for summary judgement, it complied with the terms of the contract. Doc. 150 at 7. Second, Gibson argues that the contract as a whole requires that Gibson give notice to North River only of those claims and incidents that have some likelihood of being worth more than one million dollars. In support, it relies on the policy provision, which states that North River will have the right, but not the obligation to investigate, negotiate, settle, or defend a claim or a suit involving the policy. Further, relying on *Southeastern Express Sys., Inc. v. S. Guar. Ins. Co. of Georgia*, 224 Ga.App. 697, 482 S.E.2d 433 (1997), Gibson claims that the prejudice to the insurer is presumed only when the late notice has robbed it of the opportunity to put up the best defense or to timely settle. Thus, Gibson argues, because North River had no duty to defend, conceded that it did not overpay the claim and that defense counsel performed competently, it cannot show

---

**2.** North River also responds to BB & T's motion for summary judgment, which is dis- cussed below.

prejudice. Third, Gibson asserts that contracts are construed so as to prevent forfeitures. Accordingly, unless Gibson's interpretation was unreasonable as a matter of law, the Court must accept its position. Fourth, Gibson contends that only by adding terms to the contract could it be found that it has failed to comply with the policy. However, it asserts that the Court has no power to rewrite the contract.

### C. BB & T's Motion for Summary Judgment

BB & T claims that it owed no legal duty to make legal determinations about Gibson's potential liability stemming from the accident, nor was there any agreement or instruction to do so. Further, Gibson provided only limited factual information about the accident to BB & T, instructed BB & T not to notify the insurers, and did not share its attorneys' assessment of the claim with BB & T. In addition, Gibson itself reported the claim to the primary carrier without BB & T's involvement. Thus, BB & T argues, Gibson did not rely on it to provide notice to North River. Finally, BB & T claims that the November 2012 notice to North River was timely and, in support, advances the same arguments as Gibson.

Gibson responds in opposition and contends that if the Court accepts North River's arguments, then it should find that BB & T breached its fiduciary and contractual duties by failing to advise Gibson to report the claim and the lawsuit to North River. In addition, BB & T kept only nominal reserves for liability purposes, which made Gibson believe that the claim value would not reach the umbrella policy. Further, after the denial of Comcast's motion for summary judgment, BB & T, without any requests or instructions from Gibson, reported the claim to North River. According to Gibson, this demonstrates that BB & T had the duty to protect its insured's interest. Finally, Gibson argues that BB & T breached its duties by not reporting the claim when North River asked for a history and description of claims or potential claims over $10,000 against Gibson.

BB & T replies and claims that it had no duty to evaluate and determine Gibson's legal liability, nor did it, as an insurance broker, contract to provide legal services to Gibson. BB & T further argues that although it would have warned Gibson not to violate a particular provision of an insurance policy had it become aware of such violation, there was no contractual agreement to evaluate and track all claims or suits against Gibson. With regard to the yearly renewal documents it submitted to North River, BB & T claims that it had no duty to individually describe the Dawsons' suit. BB & T merely passed on loss runs and information about claims that it received from Gallagher Bassett. In addition, the policy imposed specific requirements on how to report a claim or a lawsuit, and did not allow providing notice in renewal applications. BB & T also disputes Gibson's assertion that it provided the notice to North River in November 2012 without any instructions from Gibson.

*Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Id.* at 324, 106 S.Ct. 2548.

In reviewing a motion for summary judgment, the Court must construe the evidence and draw all inferences from the evidence in the light most favorable to the non-moving party. *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988). But, the Court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*Discussion*

I. North River's and Gibson's Cross–Motions for Summary Judgment

■ The Court denies Gibson's motion for summary judgment and grants North River's motion for summary judgment because the record shows that Gibson failed to comply with the notice requirements outlined in the excess insurance coverage contract. Gibson's arguments why it believed it had no obligation to report the accident, Comcast's indemnity claim and subsequently the Dawsons' lawsuit to North River were premised on unreasonable assumptions and are belied by the record.

■ The construction of a contract is a question of law for the court, but whether notice is timely is ordinarily a question of fact for the jury to determine. O.C.G.A. § 13–2–1; *Evanston,* 111 F.3d at 860. However, where the facts as asserted by the insured are such that, if established, there could be no recovery, or where the undisputed facts are such that would preclude the insured's recovery, then the question becomes one of law for determination of the court and a proper matter for disposition by summary judgment. *Evanston,* 111 F.3d at 860. Under Georgia law, "likely" means "probable," not merely possible. *Lumbermens,* 214 Ga.App. at 25, 447 S.E.2d 89. The insured's determination controls, but it must be based upon sound reasons. *Evanston,* 111 F.3d at 860–61. "Mere guesswork will not be enough; ignorance is no defense. An insured cannot be heard to say it did not know when it did not inquire. The insured must use due diligence and take appropriate steps to make an informed judgment regarding the nature and amount of the claim." *Id.* at 861.

■ Georgia courts have held that a delay of as little as three months between the filing of a lawsuit and notice to the insurer is unreasonable as a matter of law. *Diggs v. S. Ins. Co.,* 172 Ga.App. 37, 321 S.E.2d 792 (1984). The Eleventh Circuit, interpreting an excess coverage contract, has held that a four-month delay between *the lawsuit* and *the date of notice* was unreasonable under Georgia law, absent a *valid excuse. State Farm Fire & Cas. Co. v. LeBlanc,* 494 Fed.Appx. 17, 23 (11th Cir.2012). Justification for failure to give notice as soon as practicable, "may not include the insured's conclusion that he was free of fault and that there was no liability to the other party. That is the very issue which the company must have reasonable opportunity to investigate with promptness, and which requires a prompt notice of the occurrence." *Richmond v. Georgia Farm Bureau Mut. Ins. Co.,* 140 Ga.App. 215, 220, 231 S.E.2d 245 (1976) (internal citation omitted).

North River received notice of the Dawsons' suit and Comcast's indemnity demands in November 2012, more than four years after Gibson had learned about Comcast's indemnity request and more than three years after Gibson was added to the lawsuit. Gibson failed to comply with *Evanston* directives. The record shows that it failed to "use due diligence and take appropriate steps to make an informed

judgment" about Comcast's indemnity demands and the Dawsons' lawsuit. *Evanston*, 111 F.3d at 861.

And the reasons for providing such tardy notices are meritless. Gibson ignored three separate provisions triggering notice requirements.

### A. Provision G1

■ It is undisputed that Gibson learned the details about the accident in June 2008. Gibson was obligated to "see to it" that North River received notice of any "Occurrence" which may result in a claim or "Suit" under the policy. It failed to do so until November 2012. Gibsons argument that this provision did not include a timeliness requirement is without merit. Under Georgia law, a notice provision is a condition precedent to coverage when the provision contains the mandatory language "you must see to it." *State Farm Fire & Cas. Co. v. LeBlanc*, 494 Fed.Appx. 17, 21 (11th Cir.2012). Here, the notice provision was triggered when Moore learned about the accident and he admittedly understood that it may result in a suit against Gibson. Once triggered, Gibson was required to provide notice as soon as reasonably possible after it had learned about the accident. *Lankford v. State Farm Mut. Auto. Ins. Co.*, 307 Ga. App. 12, 14, 703 S.E.2d 436 (2010). The G1 provision would be pointless if the Court were to accept Gibson's interpretation that notice about an "Occurrence" could have been provided at any time.

The record shows that until October 2008, Gibson did nothing to investigate its potential exposure. Nor has it attempted to show anything that prevented it from acting promptly. The only explanation for this course of inaction was that Moore, who had no legal training, "based on common sense," did not see how Gibson "would be tied into that accident." Moore depo. at 32. And only after October 15,

2008, when Moore assigned Bordersto be Gibson's "liaison" with Gallagher Bassett, did Gibson start looking for the indemnification contract with Pheckvision and "fig-ur[ing] out when and where" the accident occurred. Borders depo. at 13. Further, Gibson did not seek legal advice concerning its exposure until July 2009. It is obvious that Gibson failed to exercise due diligence and did not take "appropriate steps to make an informed judgment regarding the nature and amount of the claim." *Evanston*, 111 F.3d at 861. Gibson's assessment under the circumstances was unreasonable. "Mere guesswork will not be enough; ignorance is no defense." *Id.*.

### B. Provisions G2 and G3

It is also undisputed that Gibson learned about Comcast's indemnity claim in June 2008. Comcast's claim was reported to the primary insurance carrier four months later, and only after Comcast sent its second demand letter. The record is clear that Comcast requested Gibson to notify its primary and excess insurance carriers not once, but twice. Pursuant to provision G2 of the policy, Gibson was required to notify North River about Comcast's claim "as soon as practicable" if it was likely to involve the policy. Again, Gibson failed to do so. Instead of responding to Comcast's demands and investigating its own potential liability, Gibson chose to ignore the matter for four months. It did absolutely nothing until October 2009 and instructed BB & T *not to* notify any insurers about Comcast's first indemnity demand. In addition, on several occasions, Moore assured BB & T that Pheckvision's insurance was handling the claim; however, Gibson was never able to locate the indemnity agreement with Pheckvision.

Further, even though Gibson was added to the Dawsons' lawsuit in May 2009, it

failed to notify North River yet again. After obtaining defense counsel, Gibson disregarded its attorney's advice to notify the excess carrier about the lawsuit. The record shows that already in August 2009, Gibson knew that the potential damages would exceed the primary coverage. Yet, it did not notify North River. The record reveals that Gibson disregarded this advice because once again, Moore "didn't see any real liability here." Moore depo. at 78. When Gibson decided not to follow Conroy Simberg's advice, Moore did not know whether counsel had analyzed the case. Although Gibson tries to hide behind its counsel's qualified opinion of "remote liability," it cannot do so for several reasons. First, it did disregard counsel's instruction to notify North River. Second, and more importantly, counsel's opinion was based, in part, on Gibson's representations about its contractual relationship with Pheckvision, i.e., that Pheckvision had an indemnity agreement with Gibson. Third, counsel did estimate the potential liability between three and five million dollars, but Gibson apparently ignored that part of counsel's opinion. In addition, Gibson's reliance on Gallagher Bassett's liability analysis is unavailing. First, Gibson did not consult with counsel to assess its potential exposure until 2009. Second, Gallagher Bassett was not able to make an accurate liability determination, especially when Gibson had assured it on many occasions that Pheckvision's insurance was handling the matter and Gibson would not be held liable. Third, Gallagher Basset did not control the reserve amounts-Gibson did. Fourth, as North River correctly points out, the token reserves were not changed for six months even after Comcast's motion for summary judgment was denied, although Gibson testified that the denial of the motion was a "game changer." Jon Martin depo. at 37. The record indicates that Gibson did not rely on Gallager Bassett's liability estimates.

██ In light of the above, Gibson's reliance on *Evanston* and *Lumbermens* is misplaced. The record shows that Gibson failed to exercise due diligence and its justifications for delay were unreasonable. Finally, there is no requirement under Georgia law that North River show it was prejudiced by Gibson's failure to give timely notices. *State Farm Fire & Cas. Co. v. LeBlanc*, 494 Fed.Appx. 17, 21 (11th Cir. 2012) (interpreting an umbrella coverage policy).

## II. BB & T's Motion for Summary Judgment

██ The Court grants BB & T's motion for summary judgement for the following reasons. First, in June 2008, Gibson, without conducting any investigation, instructed BB & T not to file a claim with its insurance providers because the sub-contractor was handling the claim and Gibson would face no liability. Second, as discussed above, when BB & T received a second notice from Comcast's counsel and the claim was finally reported to the primary insurer in October 2008, notice to North River would have already been tardy as a matter of law. Third, BB & T was not qualified to advise Gibson about its potential liability under the circumstances—Gibson should have sought legal advice and followed it. Fourth, Gibson disregarded its counsel's advice to report the Dawson lawsuit in July 2009 and counsel's estimate of potential liability in August 2009. Fifth, Gibson did not share its counsel's opinions with BB & T. Thus, the Court grants BB & T's motion for summary judgment.

## Conclusion

For the reasons stated above, the Court GRANTS North River's and BB & T's motions for summary judgment [# 121, # 69], and DENIES Gibson's motion for

summary judgment [# 71]. The Court DI-RECTS the Clerk to enter final judgment in favor of North River and BB & T declaring that North River's policy affords no coverage to Gibson with respect to the claims underlying this action and dismiss-ing Gibson's third-party complaint against BB & T.